**HYATT CORPORATION,**
Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent/
Cross–Petitioner.

Nos. 89–6407, 90–5697.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 11, 1991.

Decided July 22, 1991.

Roger K. Quillen (argued), Fisher & Phillips, Atlanta, Ga., for petitioner cross-respondent.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Charles P. Donnelly, Jr. (argued), David Seid, N.L.R.B., Office of the Gen. Counsel, Washington, D.C. and Gerald P. Fleischut, Director, N.L.R.B., Region 26, Memphis, Tenn., for respondent cross-petitioner.

Before NELSON and SUHRHEINRICH, Circuit Judges, and HACKETT, District Judge.*

HACKETT, District Judge.

Petitioner, Hyatt Corporation (Hyatt or Petitioner), seeks review and the National Labor Relations Board (NLRB or Board) seeks enforcement of the Board's decision and order finding the petitioner to have violated sections 8(a)(1), (3), (4), and (5) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. §§ 158(a)(1), (3), (4), and (5), during and after the successful union campaign at the Hyatt Regency Hotel in Memphis, Tennessee. *See, Hyatt Hotels Corp.,* 296 N.L.R.B. No. 36, 132 L.R.R.M. 1131 (August 25, 1989). We find, with one exception, that the decision and order of the Board is supported by substantial evidence and, accordingly, we affirm.

## BACKGROUND

The Hyatt Regency Memphis has operated a hotel in Memphis, Tennessee, since September, 1975. Hyatt used "timesheets"

* The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation.

to compute pay for its hourly employees. The employee handbook explained the procedure for these time records which were to be completed by employees on a daily basis. Employees were to enter the time they arrived for work, took a lunch break, or departed from work, and to sign their name next to each entry. Employees received a thirty-minute lunch break for which they were not paid. The actual practice and procedure for completing time sheets varied somewhat by department, and between individuals, with some individuals making all entries at the end of the day while others made each entry separately. The handbook further provided that employees:

> may not alter or falsify any control card or time sheet, nor pull another employee's control card, or knowingly allow another employee to pull your card or fill in your time on the sign in sheet. Violation of this rule will be cause for immediate disciplinary action.

Employees were inconsistently and infrequently disciplined for making incorrect entries on time sheets. The falsified time sheets were, in many instances, simply corrected by individual managers who did not initiate disciplinary action. Between 1975 and April, 1981, Hyatt had disciplined a total of eighteen employees for falsifying time records. Of this number, ten employees were fired for the initial violation, five others were discharged after having received prior warnings, one employee was suspended, and two were fired for other reasons after having received warnings for falsifying time records. Employees also routinely disregarded the rule and signed in and out for one another, often in the presence of supervisors. No employee had been disciplined for signing in or out for a fellow employee.

The employee handbook also reflected Hyatt's pre–1981 compensation policy. Prior to 1981, Hyatt usually reviewed wages in May and November coincidental with its semi-annual performance evaluations. Hyatt gave wage increases, if any, at its discretion. The factors taken into account were employee merit, the federal minimum wage, and a yearly survey of wages among its competitors, as well as the performance of the hotel. All hourly employees who had completed their probationary periods were considered for wage increases.

On April 1, 1981, the hotel's parent corporation published "Policy 302," a wage review and adjustment policy which instructed individual hotels to maintain, review, and update a written wage plan. The policy provided that the amount of a wage increase in each job classification during the first three years of service was to be based on longevity. Employees would automatically receive longevity increases, unless their performance was unsatisfactory. Hourly employees, whose work performance was superior, were to be given merit increases. In order to determine entry level wages, as well as the amount of the yearly longevity and any merit increases, the company was to rely upon the minimum wage and bi-annual surveys of competitor's rates. Policy 302 left to the discretion of local management the amount of any longevity differentials; the circumstances in which wage rates should be adjusted in response to surveys; and the method to be used in determining the amount and frequency of merit increases.

Hyatt did not develop or publish a written plan as required by Policy 302, but did take some action in compliance with the policy in mid–1981. In July, 1981, Hyatt gave out longevity differentials and raised starting rates based on its survey of area wages. Following the first wage survey, the company revised its entry level wage in July, 1981, and also implemented a "10 cent policy" for longevity increases. Under this policy, employees received a ten cent per hour increase at the end of their first year, an additional ten cents at the end of the second year and a final ten cent longevity increase at the end of their third year of service.

In July, 1981, the Highway and Local Motor Freight Employees Local Union 667 (Union), affiliated with the Teamsters, began an organizational campaign among Hyatt's employees. A Board representation hearing was conducted at which Ru-

thie Myles, a Hyatt employee, appeared on behalf of the union. An election was scheduled for September 9, 1981.

During the six months preceding the September election, Hyatt took no disciplinary action for violations of its timesheet rule. In fact, during that period, Hyatt's Executive Chef, Anthony Pologruto, regularly changed timesheets for employees when he compiled records from the timesheets. These changes included altering the employee's arrival or departure time and changing the timesheets to indicate that employees had taken a lunch break. Pologruto warned Ruthie Myles, however, that employees were "getting away with" a lot, and that things would change "if the union got in." During that same period, supervisor Greg Goosman changed employee John Scott's timesheet approximately 10–15 times without imposing any discipline. David Morgan, Hyatt's Assistant Chief Engineer, ignored incorrect sign-in times and instructed employee Scott Monson and other employees to falsify timesheets in order to minimize "headaches."

On July 24, 1981, Hyatt's General Manager Cody Plott held a general meeting for all employees at which he announced that he was "tearing up all employee warning notices," and that employees could come to him personally with problems because his door was always open. During the same month, Hyatt's Executive Housekeeper Bruce Nelker required eight to ten employees under his supervision to tell him how they felt about the union.

During the month of August, Hyatt's Director of Engineering Robert Poole twice interrogated employee Dion Mathis about his union sentiments. Poole also interrogated employee Linda Shirley about her union sentiments and told her "if [she] had a problem, feel free, [my] door is always open." Poole ordered Monson to remove a union button and told him that wearing a union belt buckle would get him "in trouble."

In September, 1981, immediately preceding the election, Nelker directed employees Linda Shirley and Carey Tucker to remove their union buttons. Reuben Criswell, Hyatt's Executive Sous Chef and a company supervisor, nominated employee Essie Butler for a raise and told her to "vote no" for the union. Criswell also told employee Mary Lott to "vote no" for the union and warned that once the union got in, employees would be "automatically fired" for eating while setting up lunch. Pologruto interrogated Ruthie Myles and told her that if the union came in, there would be a lot of changes and employees would lose benefits. Dannye Chapman, Hyatt's Assistant Director of Housing and a company supervisor, told employees Levy Harrison and Betty Lewis to vote for the union because "[i]t will make it easier for the company to kick [those employees] out the door."

During the union election held on September 9, 1981, Ruthie Myles and Linda Shirley acted as union observers. The union was certified as the employees' bargaining representative on November 27, 1981. Shortly after the election, Hyatt began strictly enforcing its timesheet rules. Scott Monson, an employee, was warned by his supervisor to be "real careful" and mark the actual time he started work because Director of Engineering Poole "was looking for mistakes." A few weeks after the election, Pologruto held a meeting with employees and announced that they could no longer sign in and out for each other.

A total of twelve employees were discharged for first-time violations of the timesheet rules in the seven months from September 11, 1981, to April 14, 1982. Among the discharged employees was Ruthie Myles, the employee who had requested that an election be certified, and Linda Shirley, who had distributed union literature and acted as a union observer at the election. Levy Harrison, a union supporter who had signed a union authorization card, became the first employee ever disciplined because someone else signed her out. She was also discharged.

Following union certification, Hyatt was advised by its attorneys not to grant any future wage increases pursuant to Policy 302. No wage surveys were conducted until the autumn of 1982, and no employee received an hourly wage increase after the

union election in September, 1981. Employees who requested raises following the election were told that no raises could be given because of negotiations with the union. Shortly after the election, the company also changed its practice of serving breakfast to employees, with no prior announcement of its intent to eliminate breakfast.

In March, 1982, the union demanded in writing that Hyatt proceed to give wage increases pursuant to its past practice. Hyatt responded in writing that it believed that it was prohibited by law from unilaterally granting discretionary wage increases during negotiations. In subsequent negotiating sessions, Hyatt continued to take the position that past wage increases had been discretionary, based in part on merit, and that if it did grant mid-negotiation increases unilaterally, the union would have to recognize them as off-sets against increases agreed upon in negotiations.

On the foregoing facts, the Board found that Hyatt violated section 8(a)(1) of the Act by interfering with, restraining, and coercing employees in the exercise of their statutory rights. The Board also found that Hyatt violated sections 8(a)(1), (3), and (5) by firing employees for timesheet violations based on its more stringent enforcement of those rules. The Board further found that Hyatt violated sections 8(a)(1) and (4) by discharging Myles because of her participation in a Board conducted election. Finally, the Board found that Hyatt violated sections 8(a)(1), (3), and (5) of the Act by unilaterally discontinuing its wage adjustment plan, changing the working hours for numerous employees in the bargaining unit, and discontinuing its practice of serving breakfast to bargaining unit employees.

The Board's order requires Hyatt to cease and desist from engaging in the unfair labor practices found, and from interfering with, restraining, or coercing employees in the exercise of their rights under the Act. The order required Hyatt to rescind the more stringent enforcement of its timesheet policy; offer the discharged employees immediate and full reinstatement with back pay and expunge the discharges from their personnel records. The Board's order also required that Hyatt give the union an opportunity to bargain about any changes in employment terms and conditions and, upon request of the union, to reinstate its wage increase policy and practice, its practice of serving employee's breakfast, and its working hours arrangement in the housekeeping department as it existed on September 9, 1981. Finally, the order required Hyatt to make employees whole for any loss of earnings suffered by the company's unlawful discontinuance of its wage adjustment plan and to post the appropriate notices.

The matters currently in dispute concern only the post-election conduct of Hyatt. Specifically, Hyatt contests the Board's findings concerning the wage increase policy and the employee discharges stemming from a more stringent enforcement of its time record falsification policy.

## STANDARD OF REVIEW

"Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal." *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 808 (6th Cir.1989) (citing 29 U.S.C. § 160(e), (f); other citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

## DISCUSSION

### I.

Hyatt challenges only those Board findings regarding its refusal to bargain by unilaterally discontinuing a wage policy and its discharge of employees based on a more stringent application of its timesheet

rule. The Board requests that the court affirm its finding that petitioner's abrogation of the wage plan violated sections 8(a)(3) and (1) of the Act,[1] as it was discriminatorily motivated. The Board asserts that petitioner is only challenging its finding that the abrogation of the wage plan violated sections 8(a)(5) and (1) of the Act. Petitioner responds that the Board falsely represents that the wage review question was analyzed independently under section 8(a)(3), noting that the Board's source was the Administrative Law Judge's (ALJ) report, which, petitioner contends, does not make specific enough mention of section 8(a)(3) to enforce the order.

"When the Board rules that an employer has committed an unfair labor practice, the employer is entitled to know, and the Board is charged with the duty of stating, the reasons why the Board concluded the facts showed a violation of the law." *NLRB v. Clement–Blythe Cos.,* 415 F.2d 78, 81 (4th Cir.1969) (citations omitted). The Administrative Procedure Act, 5 U.S.C. § 557(c), provides in pertinent part:

All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—

(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law or discretion presented on the record; and

(B) the appropriate rule, order, sanction, relief, or denial thereof.

■ This requirement that an agency state the reasons or basis for its decisions is important for judicial review of administrative adjudications. Disclosure of administrative reasoning informs both the parties and the court of the basis for the disposition of the case by the agency; imposes a discipline on the agency which prevents haphazard or arbitrary administrative action; and prevents the agencies and the courts from exceeding jurisdictional limitations. *Flav–O–Rich, Inc. v. NLRB,* 531

F.2d 358, 362 (6th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 358 (1977) (citations omitted). "Our scope of review over administrative decisions is limited and we are entitled to have the benefits of the Board's expertise in this area before we are called upon to rule on important questions of law and policy." *Id.* Courts are not at liberty to speculate on the basis of an administrative agency's order. *Id. See also Great Lakes Screw Corp. v. NLRB,* 409 F.2d 375, 379 (7th Cir.1969).

■ The only reference to the wage issue in the Board's decision and order is at footnote 2, where the Board states that it agrees with the ALJ's finding that the unilateral discontinuance of the wage increase plan violates section 8(a)(5). The Board's decision and order does not address a section 8(a)(3) violation in connection with the wage review issue, and the ALJ's report focuses only upon this issue in connection with an 8(a)(5) violation. Section 8(a)(3) is first mentioned in connection with the wage review issue in the ALJ's Conclusions of Law which state that Hyatt "violated Section 8(a)(1), (3), and (5) of the Act."

In its appellate brief, the Board cites several reasons in support of a finding that the company's abrogation of its wage plan was discriminatorily motivated and thus, a section 8(a)(3) violation. This reasoning does not appear in either the ALJ's report or the Board's decision and order. The court is not free to accept " 'appellate counsel's *post hoc* rationalization for agency action' in lieu of reasons and findings enunciated by the Board." *Flav–O–Rich,* 531 F.2d at 362 (citing *NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 444, 85 S.Ct. 1061, 1064–65, 13 L.Ed.2d 951 (1965)). *See also International Ass'n of Bridge, Structural and Ornamental Iron Workers v. NLRB,* 792 F.2d 241, 247 (D.C.Cir.1986). Thus, in the absence of articulated findings and reasons, the question of whether petitioner's unilateral change in the wage in-

---

1. Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), provides:

(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

crease plan is also a violation of section 8(a)(3) is remanded to the Board for further findings.

■ Finally, the Board asserts that because petitioner is challenging only those portions of its order relating to the wage policy and employee discharges, the court should summarily enforce the balance of the order. If a company fails to address or take issue with the Board's findings and conclusions with regard to violations of the Act, then the company has effectively abandoned the right to object to those determinations. *NLRB v. Valley Plaza, Inc.,* 715 F.2d 237, 240–41 (6th Cir.1983); *NLRB v. Tennessee Packers, Inc.,* 344 F.2d 948, 949 (6th Cir.1965). Therefore, the uncontested portions of the Board's decision and order are hereby ordered enforced.

## II.

Petitioner challenges the Board's finding that it violated sections 8(a)(1) and (5) of the Act[2] by unilaterally discontinuing its wage adjustment program without bargaining with the union. Hyatt asserts that, according to *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), it could not lawfully adjust wages under Policy 302 because it was neither a longstanding nor a nondiscretionary practice. Because it was in the midst of bargaining with the union in 1982, petitioner determined for itself that unilateral wage adjustments would have been unlawful.

Petitioner first argues that *Katz* requires a practice to be both automatic and nondiscretionary. Hyatt contends that when a company exercises considerable discretion in the timing and amount of raises or when wage increases are based on management's assessment of individual employee performance, wage increases are neither automatic nor nondiscretionary under *Katz.* Hyatt asserts that Policy 302 was not automatic and nondiscretionary in

that it depended on management discretion because employees' work was required to be evaluated as "satisfactory" prior to qualifying for a wage increase.

Petitioner further argues that *Katz* also requires a program to be longstanding. Hyatt asserts that it would have been unlawful to unilaterally grant the wage increases because such increases had been granted only once prior to the union election. Petitioner contends that although this court has never decided how long a program must be followed before it constitutes longstanding for *Katz* purposes, in every case in which wage and benefit reviews were upheld in the face of bargaining, the company's practice had been followed for substantially more than one year. Petitioner further asserts that the only exception to *Katz*'s longstanding requirement is the situation in which an employer has created an employee expectation that raises would be automatically forthcoming. Hyatt contends that it had not promised employees any future wage increases on a particular basis and that, therefore, it created no expectation among employees that the July, 1981, program had become the status quo.

Additionally, Hyatt argues that it is caught in a dilemma because it would have risked committing an unfair labor practice if it had granted wage increases after the election and that the Board has now found it to have committed an unfair labor practice by not granting post-election wage increases. Finally, Hyatt asserts that its action represents a good faith attempt on its part to comply with the rule set forth in *Katz.*

■ Hyatt's arguments are incorrect both as matters of fact and of law. On the factual issue, the record indicates that under Policy 302 there was actually minimal discretion involved in the decision whether to grant the three-year longevity increases.

---

**2.** Sections 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5) provide:

 (a) It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

Lynn Taggert, the personnel director, testified that those increases were to be "automatic," both as to amount and timing, unless an employee's performance was deemed unsatisfactory. Although a measure of discretion informed the decision as to whether particular individuals qualified for the longevity increases, the procedures for granting the increases and the amount to be granted were predetermined. The factual record also clearly supports the Board's finding that wage increases pursuant to Policy 302 had become the established practice of Hyatt. The "10 cent policy" implemented in July, 1981, provided a specific plan for determining when the longevity increases would be paid to employees in the future. The September, 1981, affidavit of General Manager Plott shows that "[f]rom now on," employees would receive the ten cent raise at the end of each of the first three years of employment. The record evidence reveals that the wage increase policy changed in mid–1981, and that the new policy became the established practice, or status quo at that time.

■ On the legal issue, *Katz* does not preclude an employer from granting merit increases during union negotiations merely because such increases contain a discretionary element. In *Katz*, an employer engaged in collective bargaining negotiations with the union granted merit increases to 20 out of 50 employees, without notice to the union. The Supreme Court found that the action "must be viewed as tantamount to an outright refusal to negotiate on that subject, and therefore a violation of § 8(a)(5)," unless the raises were in line with the company's longstanding practice of granting quarterly or semiannual merit reviews, "in effect, were a mere continuation of the status quo...." 369 U.S. at 746, 82 S.Ct. at 1111. The Court specifically distinguished merit raises which were part of an established practice and, thus, the status quo, from those which had not been the employer's previous practice.

> Whatever might be the case as to so-called "merit raises" which are in fact simply automatic increases to which the employer has already committed himself, the raises here in question were in no

sense automatic, but were informed by a *large measure* of discretion. There simply is no way in such case for a union to know whether or not there has been a substantial departure from past practice, and therefore, the union may properly insist that the company negotiate as to the procedures and criteria for determining such increases.

*Id.* at 746, 82 S.Ct. at 1111 (emphasis added).

Thus, *Katz* makes clear that a wage increase cannot be viewed as automatic if it depends, to a large measure, upon the employer's discretion so that the union would not be able to determine whether it was in line with a company's past practice. The fact that a wage or merit increase is partly discretionary does not give an employer carte blanch to forgo the increase. In *NLRB v. Newtown Corp.*, 705 F.2d 873, 874 (6th Cir.1983), the evidence suggested that it was the company's policy to grant raises every six months, economic conditions permitting. This policy would imply some discretion on the part of the employer in determining whether economic conditions permitted raises. The court found that if that was in fact the company's policy, granting those raises post-election would not be an unfair labor practice.

In *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173 (D.C.Cir.1981), the court found that *Katz* did not support the employer's decision to withhold annual pay increases which were based in part on discretionary merit criteria. Because the wage increase contained both automatic and discretionary elements, the court determined that it could not be considered to be entirely automatic due to its dependence, in part, on an employee's job classification. The court held:

> Under the circumstances, if the company wished to discontinue entirely the practice of granting annual wage increases, it was required to bargain with the union first; *Katz* requires an employer to consult with the union before changing an existing condition of employment. But even if it did not wish to discontinue the practice of granting annual wage increases, it was required to consult with

the union. The company could not unilaterally determine the size of the increase that each employee would receive; it would be required to bargain over this discretionary element.

659 F.2d at 1189 (citing *General Motors Acceptance Corp. v. NLRB*, 476 F.2d 850, 854 (1st Cir.1973); *NLRB v. United Aircraft Corp.*, 490 F.2d 1105, 1109–11 (2d Cir.1973); *International Union, UAW v. NLRB*, 455 F.2d 1357, 1365–66 (D.C.Cir. 1971); *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98 (5th Cir.1970); *Oneita Knitting Mills, Inc.*, 205 N.L.R.B. 500 (1973)).

The court, in a footnote, provided further guidance on the procedure an employer is required to follow when wage increases contain both automatic and discretionary elements.

> Where the company wishes to continue the practice of granting partly discretionary wage increases, it may do so during the bargaining period without violating the labor laws so long as it is willing to confer with the union if the wages are questioned. In other words, it need not bargain *before* it grants the raise.

659 F.2d at 1189 n. 98 (citing *General Motors Acceptance Corp. v. NLRB*, 476 F.2d at 854) (emphasis in original).

■ Substantial evidence supports the Board's finding that Hyatt's discretion in the wage increases at issue was minimal. Thus, it could not unilaterally forgo the increase. Instead it was required to bargain with the Union over whether to discontinue the increase or grant the increase and bargain over the discretionary factors if requested to do so by the Union.

The cases cited by petitioner in support of the proposition that an employer cannot unilaterally grant wage increases based upon management's assessment of an employee's performance can be factually distinguished. In each case, the employer's discretion extended beyond performance

evaluations and, thus, constituted a large measure of discretion.[3]

■ Petitioner is also incorrect in interpreting *Katz* as prohibiting all wage increases which are not in accordance with a company's "longstanding" practice. This circuit has previously had the opportunity to apply *Katz*. In *NLRB v. Allied Products Corp.*, 548 F.2d 644 (6th Cir.1977), the court found that where, after members of the bargaining unit had selected the union as their representative, the employer unilaterally changed an existing condition of employment by discontinuing its previously established merit wage review program the employer had violated section 8(a)(5) of the Act. The court held:

> The Act is violated by a unilateral *change* in the existing wage structure whether that change be an increase or the denial of a scheduled increase. Because the Company unilaterally *changed* an existing condition of employment, instead of maintaining the status quo, the Board properly found that it had committed an unfair labor practice.

548 F.2d at 653 (emphasis in original).

In *Peabody Coal Co. v. NLRB*, 725 F.2d 357 (6th Cir.1984), the court found that the existence of "an established practice" was the central inquiry in *Katz* situations. The court noted that evidence of an established practice is necessary to determine whether an employer has effected a unilateral change in the conditions of employment. 725 F.2d at 365. *See also Dothan Eagle*, 434 F.2d at 98 ("The cases make it crystal clear that the vice involved ... is that the employer has *changed* the existing conditions of employment. It is the *change* that is prohibited....") (emphasis in original); *United Aircraft*, 490 F.2d at 1109 ("It is clear that conditions of employment include not only what an employer has already granted but also what it has announced it

---

**3.** *NLRB v. Allis–Chalmers Corp.*, 601 F.2d 870 (5th Cir.1979) (employer exercised discretion in both the timing and amount of wage increases); *NLRB v. Ralph Printing & Lithographing Co.*, 433 F.2d 1058 (8th Cir.1970), *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971) (no specific time interval between the time of hiring

and the time of any wage increase and the increase depended *solely* on the company's determination of both the employee's proficiency and attitude); *NLRB v. John Zink Co.*, 551 F.2d 799 (10th Cir.1977) (employer granted merit increases to *some* employees).

intends to grant"). In *Newtown Corp.*, 705 F.2d 873, this court, without finding a long-standing practice of increasing wages, held that a company could unilaterally increase wages pursuant to its policy of granting six month raises, even if many of the employees had not been notified about the policy. *Id.* at 874.

The focus of the inquiry, therefore, is on the existence of an established practice or status quo. Whether a practice is long-standing is a factor to be evaluated in determining whether or not an employer's practice is an established one. Other factors may include whether the employer has created an expectation on the part of employees, whether an employer has announced a policy or taken other action consistent with a formal policy change. These are not requirements and/or exceptions to requirements as petitioner argues. Rather, they are factors to be evaluated.

Petitioner cites a series of Ninth Circuit cases in support of its contention that "longstanding" is a *Katz* requirement. These cases did not involve a plan instituted by an employer as a recurring benefit for the indefinite future and are, thus, distinguishable.[4] The most recent case cited, *Aaron Bros. Co. v. NLRB*, 661 F.2d 750 (9th Cir.1981), provides some indication that the Ninth Circuit may in fact be moving away from its singular practice of relying heavily on the length of time a practice has been in place in analyzing this issue. In that case, the court held that the existence of an established formula must be considered in addition to how long an employer's practice had been in effect. In remanding the case for a determination of whether the wage increase was a violation of the status quo, the Ninth Circuit suggested that the wage increase may have violated the Act because it was apparently not made pursuant to any defined policy. *Id.* at 754.

■ In this case, the fact that the wage increases had not yet ripened into a long-standing practice is not dispositive. Although the wage policy was in existence for only a short time prior to the election, the evidence demonstrates that the July, 1981, wage increase was not an isolated event, but was made pursuant to pre-established guidelines embodied within a policy which the company intended to continue indefinitely. The factual record does not support Hyatt's contention that it created no expectation in its employees regarding future wage increases. That question, however, need not be developed further in light of the clear factual record supporting the Board's finding that the wage increase policy was an established practice. Having altered the status quo by implementing this wage policy, the company is bound to abide by its previously ordained schedule of wage increases following union certification.

■ Hyatt's contention that its unilateral discontinuance of the wage increases was its good faith attempt to apply *Katz* to the dilemma it was faced with is without legal merit. This court has previously determined that proof of a section 8(a)(5) violation based upon unilateral changes in the conditions of employment cannot be rebutted by showing either an employer's good faith or absence of anti-union animus. *Allied Products*, 548 F.2d at 652. Relying on *Katz*, the court found that a determination of an employer's refusal to negotiate does not require a failure of subjective good faith.

> The fact that the Company offered to discuss *reinstitution* of the merit increases does not mitigate the violation by unilaterally *discontinuing*, without negotiation with its employees' representative, the established merit review procedure.
>
> Nor is the Company's argument, that it has "been caught between the devil and the deep blue sea," sound. It is correct that in some circumstances it will be an unfair labor practice to grant unilaterally a wage increase, and that in

---

**4.** *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403 (9th Cir.1977) (only one prior wage increase had been given and that increase had also been found to constitute an unfair labor practice); *NLRB v. Nello Pistoresi & Son, Inc.*, 500 F.2d 399 (9th Cir.1974) (court found the combination of short history and indefinite nature to be fatal).

other circumstances it will be an unfair labor practice to deny unilaterally a wage increase. The Act is violated by a unilateral *change* in the existing wage structure whether that change be an increase or a denial of a scheduled increase.

*Id.* at 652–53 (citations omitted) (emphasis in original). *See also Dothan Eagle,* 434 F.2d at 98.

 Petitioner also disputes the Board's conclusion that Hyatt unlawfully denied longevity increases after July, 1982. Petitioner asserts that the Board had no evidence before it as to any facts or circumstances existing after July, 1982. Petitioner also argues that the union's rejection of the company's August 5, 1982, offer to reinstate its past practices terminated its liability for backpay. Alternatively, Hyatt argues that its backpay liability ended in February, 1983, when impasse was reached.

We find these arguments to be premature. Any questions concerning the company's backpay liability can be resolved in a separate back pay proceeding following enforcement of the Board's order. *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960). "The Board has the discretion to compute the amount of an award and to make factual determinations affecting the amount of the award at a compliance hearing following the enforcement of its order." *American Distrib. Co., Inc. v. NLRB,* 715 F.2d 446, 452 (9th Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984) (citations omitted).

### III.

### A.

Hyatt also challenges the Board's finding that it violated section 8(a)(1) and (5) of the Act by its more stringent post-election enforcement of the timesheet rules. The Board determined that this more stringent enforcement of the timesheet rules after the union election represented a change in the employees' terms and conditions of employment over which the company had an obligation to bargain.

Petitioner argues that the Board erred in holding that Hyatt could not enforce the rule against falsifying time records because of the lack of evidence to support a finding of unilateral change. Hyatt argues that because employees had previously been discharged or disciplined under the rule, there was no evidentiary support for the Board's finding that Hyatt unilaterally changed from a system of lax and sporadic enforcement of the rule to one of stringent enforcement.

Petitioner further argues that, even if there was greater enforcement of the rule, the law allows employers to tighten enforcement of prior existing rules provided the enforcement is uniform. In support of that contention, Hyatt cites *United States Postal Service,* 275 N.L.R.B. 360 (1985). Hyatt argues that expecting employees not to falsify records and steal time from an employer does not exceed those requirements reasonably expected of employees and falls within normal day-to-day operating decisions. Hyatt asserts that no employer should have to tolerate employee theft of time.

While an employer need not be expected to tolerate employee theft of time, the record in this case clearly reveals that for a significant period of time, Hyatt did in fact tolerate and, in some circumstances, encouraged it. Enforcement of the time sheet rules appears always to have been lax and sporadic. In the six months preceding the election, it was nonexistent. There is substantial evidence in the record showing that supervisors not only condoned employee abuse of the rule, but also, in varying degrees, participated in it. There is also substantial evidence that, after the union election, company supervisors specifically told employees that they could no longer sign in or out for each other, and specifically warned employees to be careful when signing in and out because the company was "looking for mistakes."

 Sections 8(a)(1) and (5) of the Act can be violated when, on the heels of a successful union election, an employer be-

gins to strictly enforce previously existing rules which had not earlier been enforced. In *Master Slack*, 230 N.L.R.B. 1054 (1977), enf'd., 618 F.2d 6 (6th Cir.1980), following a union election, the employer announced that its previously promulgated rules concerning absenteeism and tardiness would be rigidly enforced. Eight employees were discharged in the first three months after the election pursuant to this more stringent enforcement. The Board found that pre-election enforcement of the rules had been lax and that no employees had been terminated for violation of the rules in the three months prior to the election. The Board held that this was an 8(a)(5) violation because the union was not notified and given an opportunity to consult on the change in these terms and conditions of employment. The Board also held that the change was part of an overall and continuing pattern of conduct aimed at undermining the union, noting that the employer had not shown that its past policy or actual practice had been to rigidly enforce these rules. The Board also rejected the employer's contention that there was an independent business justification. Because no employees had been discharged for violation of the absentee and tardiness rules in the twelve weeks preceding the election, the Board concluded that there was no absentee problem to be solved which would justify more stringent enforcement and, thus, no independent business justification. *See also Sevakis Industries*, 238 N.L.R.B. 309 (1978), enf'd., 652 F.2d 600 (6th Cir.1980).

Petitioner's reliance on *United States Postal Service*, 275 N.L.R.B. 360 (1985), in support of its contention that more stringent enforcement of work rules does not violate the Act so long as it is done uniformly, is misplaced. That case does not turn on the uniform application of rules, but rather, upon the fact that in the past the employer had in fact enforced the rules. Nor does that case announce, as a proposition of law, that post-election enforcement of previously established rules which were not consistently enforced, does not violate the Act as long as enforcement is uniform. Hyatt's contention is, therefore, inaccurate as a matter of law.

In *Postal Service*, the employer's ten-minute break policy had been posted in the break room and two out of three shifts abided by that policy. The employees on the third shift had, however, customarily taken fifteen-minute breaks. The Board found that, although no employee had ever been disciplined because of this, the employer had on several occasions attempted to enforce the rule on the third shift, with limited success. The Board held that the failure to previously discipline employees for violation of the break rule constituted only a partial breach of its otherwise uniform enforcement and, thus, was inadequate to support an 8(a)(5) violation.

■ There is no partial breach of uniform enforcement in this case. Enforcement of the rule by Hyatt supervisors was lax and sporadic. Supervisors not only tolerated infractions by the employees but also, in many instances, aided or encouraged employees in violation of the rules. There is simply no evidence to support Hyatt's contention that its past or actual practice had been to uniformly enforce these rules. Thus, uniform enforcement constitutes a change in the terms and conditions of employment, which requires notice to and consultation with the union. Hyatt failed to do this and, thus, violated section 8(a)(5) of the Act.

### B.

Petitioner also contests that portion of the Board's order finding the employee discharges were in violation of section 8(a)(3) and (1) of the Act. Petitioner does not, however, argue the Board's finding with respect to the discharge of Ruthie Myles.

The first issue raised by petitioner is the applicable burden of proof in discriminatory discharge cases. Petitioner asserts that the Board erroneously shifted the burden to Hyatt based solely on statistical evidence. Citing *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), petitioner contends that the General Counsel carries the burden of proving by a preponderance of evidence that anti-union animus was a sub-

stantial and motivating factor in the employer's decision to discharge, a burden that does not shift. Hyatt asserts that *Transportation Management* does not specify what level of showing the General Counsel must make in order to shift the burden to the employer. The Board has held that the General Counsel must make a showing "sufficient to support the inference" that protected conduct was the motivating factor.

Petitioner argues that the Supreme Court has rejected the Board's position, relying upon the Court's recent Title VII cases. According to petitioner, in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Court further explained the analysis of *Transportation Management*, holding that, in order to shift the burden, General Counsel must do more than merely raise a prima facie inference of discriminatory motive. Petitioner argues that General Counsel must make a strong showing by direct evidence that illegal discrimination was a substantial and motivating factor.

Petitioner argues that the Title VII analysis must be identical to the analysis under the NLRA. In support, petitioner points out that both *Transportation Management* and *Price Waterhouse* have roots in *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Petitioner further contends that another Title VII case, *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), relied upon *Transportation Management* as authority for limiting the

circumstances where burden shifting is appropriate, holding that the burden cannot be shifted based upon mere statistical inference of discrimination. Petitioner asserts that in this case, the Board relied solely upon a statistical inference.

■ Under *Wright Line*, 251 N.L.R.B. 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the General Counsel is required to make a *prima facie* showing sufficient to support the inference that protected conduct was a motivating factor in an employer's decision to discharge an employee. This burden does not shift. The employer can, however, avoid a finding that it violated the Act if it can show, by a preponderance of the evidence, that the employee would have been discharged even in the absence of protected conduct. The burden placed upon employers in *Wright Line* was validated by the Supreme Court in *Transportation Management*. The employer's responsibility is more akin to an affirmative defense than to a shifting of the burden of proof and is one of persuasion rather than mere production, requiring that the employer make the showing by a preponderance of the evidence.

In *Price Waterhouse*, a majority of the Court held that when a Title VII plaintiff proves that gender played a motivating part in an employment decision, the employer may avoid liability only if it proves by a preponderance of evidence that it would have made the same decision even if it had not taken plaintiff's gender into account.[5] 490 U.S. at 258, 109 S.Ct. at 1795.

5. It cannot be said with certainty that *Price Waterhouse* requires a Title VII plaintiff in a mixed-motive case to make a strong showing by direct evidence that discrimination was a substantial and motivating factor in an employment decision. Other than the limited holding in the case, no one view commanded a majority. Justice O'Connor would clearly require this level of showing on plaintiff's part. "In my view, in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an illegal criterion was a substantial factor in the decision." 490 U.S. at 276, 109 S.Ct. at 1804 (O'Connor, J., concurring).

The plurality did not, however, decide the amount or type of evidence required of plaintiff. By focusing on Hopkins' specific proof, however, we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision, and we refrain from deciding here which specific facts, 'standing alone', would or would not establish a plaintiff's case, since such a decision is unnecessary in this case. *Id.* at 251–52, 109 S.Ct. at 1791 (plurality opinion). The plurality opinion would also seem to distinguish any such Title VII requirement from application to NLRA cases.

Price Waterhouse concedes that the proof in *Transportation Management, supra,* adequate-

■ Although we have doubts that the Title VII analysis is applicable to cases under the NLRA, we need not reach that issue in this case.[6] Assuming, *arguendo*, that petitioner's argument has merit,[7] the General Counsel did in fact establish by direct evidence, in addition to statistical evidence, that the termination of all twelve employees was substantially motivated by anti-union animus. There is no merit to Hyatt's argument that the Board failed to prove a prima facie case because it relied solely on "statistical inference" of improper motive. Although the Board did in fact consider the dramatic increase in the number of employees discharged post-election, the Board also relied upon evidence of disparate treatment, general union animus and the specific threats of the employer's representatives that after the election things would change, as well as post-election warnings that the company was looking for mistakes. There is substantial evidence that the employer made it plain to the employees that lax enforcement of the rules was contingent upon the lack of a union. In addition, the record is replete with direct evidence of general union animus which the employer does not contest.

■ There is also no merit to the company's contention that the General Counsel failed to make its prima facie case because it did not prove that Hyatt had knowledge of the union sentiments of each of the discharged employees. Hyatt argues that this proof of knowledge of union sentiment is an indispensable prima facie element. This court has previously made clear that it is not indispensable and where a system as a whole was implemented for a retaliatory purpose, the Board need not find illegal motivations as to specific individuals.

■ Generally, the General Counsel is required, in a typical section 8(a)(3) case, to demonstrate that the employer was aware of the pro-union sentiments of individual employees. *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985). However, "the General Counsel may also prevail by showing that the employer ordered general lay-offs for the purpose of discouraging union activity or in retaliation against its employees because of the union activity of some." *Id.* at 1180.

Moreover, the theory can be valid even though not all union adherents were laid-off. The focus of the theory is upon the employer's motive in ordering extensive

---

ly showed that the employer there had relied on an impermissible motivation in firing the plaintiff.... But the only evidence in that case that a discriminatory motive contributed to the plaintiff's discharge was that the employer harbored a grudge toward the plaintiff on account of his union activity; there was, contrary to Price Waterhouse's suggestion, *no direct evidence* that the grudge had played a role in the decision, and in fact, the employer had given other reasons in explaining the plaintiff's discharge.

*Id.* at 257, 109 S.Ct. at 1794 (plurality opinion) (emphasis added). It would be reasonable to conclude, based on the plurality opinion, that the plaintiff's burden in NLRA cases remains unaltered.

6. *Wards Cove Packing, supra,* a disparate impact case, is inapposite. Appropriate analogy to Title VII cases, if any, is limited to disparate treatment cases. *See Sonicraft, Inc. v. NLRB,* 905 F.2d 146 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991).

7. Assuming petitioner's argument that Title VII standards apply to union discrimination cases arising under the Act is without merit, this court

has previously determined what types of evidence the Board may rely upon.

The Board may rely on all the evidence, including direct admissions as well as circumstantial evidence, in determining actual motive. Circumstantial evidence alone may be sufficient. Anti-union motivation may be reasonably inferred from a variety of factors, such as a company's expressed hostility towards unionization together with knowledge of the employees' union activities, proximity in time between the employees' union activities and their discharges, the inconsistencies between the proffered reason and other actions of the employer, and disparate treatment of certain employees compared to other employees with similar work records or offenses. Furthermore, where an employer's representatives have announced an intent to discharge or otherwise retaliate against an employee for engaging in protected activity, the Board has before it especially persuasive evidence that a subsequent discharge of the employee is unlawfully motivated.

*Turnbull Cone Baking Co. v. NLRB,* 778 F.2d 292, 297 (6th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986) (citations omitted).

**376**

lay-offs rather than upon the anti-union or pro-union status of particular employees. The rationale underlying this theory is that general retaliation by an employer against the workforce can discourage the exercise of section 7 rights just as effectively as adverse action taken against only known union supporters.

*Id.*

Hyatt's contention that twelve instances of post-election disciplinary action over a seven-month period does not have a sufficient "chilling effect" upon employees to dispense with requiring the Board to prove direct knowledge of union sentiments is incredible and does not merit further discussion. There is no evidentiary support for Hyatt's contention that economic motivation was the sole reason for enforcing the rules more stringently.

### C.

 Finally, petitioner argues that because the individuals were discharged with cause, the Board cannot order back pay and is limited to ordering reinstatement only. Petitioner notes that all the dischargees have admitted to falsifying time records and that they were, therefore, discharged for cause. Petitioner cites *NLRB v. Kahn's & Co.*, 694 F.2d 1070 (6th Cir. 1982) and *General Motors Corp. v. NLRB*, 674 F.2d 576 (6th Cir.1982) in support of this argument.

These cases are inapposite and applicable only when it is found that the employer's unfair labor practice had no effect on the discharge decision. In *NLRB v. Kahn's & Co.*, the court held that where evidence independent of the employer's improper conduct discloses that an employee has been discharged for good cause, section 10(c) of the Act, 29 U.S.C. § 160(c), precludes an order of back pay and reinstatement. 694 F.2d at 1072 (citing *General Motors Corp. v. NLRB*, 674 F.2d 576 (6th Cir.1982)).

The discharges in this case, however, were unlawfully motivated, and thus, are not independent of the employer's unlawful conduct. The discharges are the unlawful conduct. Reinstatement and back pay will

do no more than restore the discharged employees to the circumstances they would have enjoyed absent their unlawful termination.

## CONCLUSION

The question of whether Hyatt's unilateral change in the wage increase plan is also a violation of section 8(a)(3) of the Act is REMANDED to the Board for further findings. The balance of the order of the NLRB is ENFORCED and Hyatt's petition for review is DENIED.