**L.W.D., INC.; L.W.D. Sanitary Landfill, Inc.; L.W.D. Trucking, Inc.; L.W.D. Field Services, Inc.; and Robert Terry, Inc.; A Single Integrated Enterprise, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 01–2273, 01–2546.

United States Court of Appeals, Sixth Circuit.

Sept. 19, 2003.

---

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Charles P. Donnelly, Jr., John R. McIntyre, National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Before NORRIS and BATCHELDER, Circuit Judges; and BARZILAY, Judge.*

## ORDER

Petitioners/Cross–Respondents L.W.D., Inc.; L.W.D. Sanitary Landfill, Inc.; L.W.D. Trucking, Inc.; L.W.D. Field Services, Inc.; and Robert Terry, Inc. (collectively "LWD") challenge certain aspects of the Decision and Order issued against them by the Respondent/Cross–Petitioner National Labor Relations Board ("Board"). The Board found that LWD violated sections § 8(a)(1), (3), and (5) of the National Labor Relations Act ("NLRA") by unilateral changes in employment conditions, failure to bargain, and a discriminatory discharge. The Board cross-petitions for enforcement of its Order.

## I

LWD is in the business of treating, storing, and disposing of industrial waste. In September 1997, the Oil, Chemical and Atomic Workers International Union, AFL–CIO ("Union") started organizing activities at LWD facilities. On September 23, 1997, the Union filed a petition with the Board for an election. The election took place on December 5, 1997, and the Union won representation of LWD employees. On December 12, 1997, LWD laid off 32 of its employees because of its financial difficulties.[1] The Union was certified on December 15, 1997.

In September 1997, LWD hired a new president, Bill O'Brien. He had previously worked for B.F. Goodrich, which used a forced-ranking system in layoffs. Under this system, supervisors rank employees based on performance and lay off the bottom performers. O'Brien testified in an affidavit that he decided to introduce this system at LWD in November 1997. Two other company officials also testified that the decision had been made in November. The implementation of the system was mentioned in the minutes of the board meeting on November 25, 1997. Those minutes state that one of O'Brien's goals after the election would be to "force-rank" employees. In the December 12 layoffs, LWD used forced ranking. Thirty-two workers at the bottom of the list were laid off. No negotiations with the Union took place over this procedure.

One of the employees laid off on December 12, 1997 was William Jeffrey Walls, an employee of LWD Trucking, Inc. Walls was the only employee of the trucking

---

* The Honorable Judith M. Barzilay, United States Court of International Trade, sitting by designation.

1. The Board held that the layoffs were forced by economic necessity and therefore did not have to be bargained over and were not retaliatory. Decision and Order, August 27, 2001 at *19–20. Of course, the manner in which layoffs are conducted may still require bargaining.

division who engaged in union activities. His name appeared on Union literature as a supporter of the Union. He was the only employee from the profitable trucking division who lost his job in the December 12 layoffs. He was also the only employee not rehired in February 1998.

In February 1998, LWD received a large job contract. To complete the work, LWD rehired some of the workers it laid off in December 1997, calling the employees into "a general labor pool," which meant not placing them in their former jobs. LWD decided to terminate these employees in March 1998, at the conclusion of the work. LWD and the Union negotiated regarding the layoffs. The parties met on March 3, 4, 10, and 11. LWD wanted to use the forced-ranking list prepared after the December 5 election. The Union opposed this procedure. The Union requested that the employees be laid off by seniority and that the laid-off workers be placed on a "preferential hiring list by seniority." In its counterproposal, LWD attempted to retain some discretion regarding who could be moved up and down in this preferential list. The Union walked out of the negotiations. LWD and the Union continued their dialogue with letters after the meetings until the March layoffs occurred. In a March 15, 1998 letter, the Union acquiesced to the use of forced ranking in the March layoff but rejected its future use. LWD rejected this proposal in a letter of the same date. LWD then reinstated the forced ranking to lay off twelve employees on or about March 16.

The Board issued a two-part order. The first part requires LWD to cease and desist from certain unfair labor practices, such as the intimidation of pro-union employees. Decision and Order, August 27, 2001 at *3. The second part requires that William Walls and those employees dismissed under the forced ranking system in December and March be rehired and made whole. Decision and Order, August 27, 2001 at *3–4. The second part of the order also directs LWD to bargain over forced ranking and general labor pool policies. *Id.*

The Decision and Order, which in essence adopted the bench decision of the administrative law judge below, had three primary conclusions of law: (1) the forced ranking system was an unlawful unilateral change in employment conditions when it was used in the December 1997 and March 1998 layoffs, violating Section 8(a)(5) of the NLRA; (2) the placement of laid-off workers in the general labor pool was an unlawful unilateral change in violation of Section 8(a)(5) of the NLRA; and (3) the discharge of employee William Jeffrey Walls was discriminatory in violation of Section 8(a)(3) of the NLRA.

## II

### A. *Standard of Review*

Three different standards of review apply to the Board's decisions. *FiveCAP, Inc. v. N.L.R.B.,* 294 F.3d 768, 776 (6th Cir.2002). First, the Board's factual determinations and its application of law to those facts are reviewed under a substantial evidence standard. *Id.* Second, where the Board interprets the NLRA, this court applies the deference standard articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Id.* Under the first step in the *Chevron* analysis, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43. If the statute is ambiguous or silent, however, under the second step in the *Chevron* analysis, the reviewing court will uphold the Board's reasonable interpretations of the statute. *Id.* at 843. Third, all of the Board's other legal conclu-

sions are reviewed *de novo*. *FiveCAP*, 294 F.3d at 776.

### B. *The Forced Ranking System*

■ LWD claims that it made the decision to switch to a forced ranking system prior to the union election. Therefore, it argues, it was not required to bargain over the use of forced ranking. The NLRA does not explicitly state when the duty to bargain attaches. In *Consolidated Printers, Inc.*, 305 NLRB 1061, 1992 WL 5863 (1992), the Board ruled that there was no duty to bargain over layoffs where the decision to lay off employees had been made prior to the election. The Board, adopting the opinion of the administrative law judge, held as follows:

The timing of a decision to lay off a particular group of employees at a particular time is critical to determining if the employer was obligated to notify and bargain about the decision or its effects.... The Board in *Embossing Printers*, 268 NLRB 710, 1984 WL 36015 (1984), dismissed a unilateral change 8(a)(5) allegation that an employer had unilaterally canceled employees' Christmas bonus after a union had been certified as representative of employees. The Board decision turned on its finding that the employer's decision to cancel the Christmas bonus was made before it became obligated to bargain with the union, i.e., before the Board-conducted election.

Turning to the instant case, I have found ... that Respondent had determined well before the election to work unit employees through the election irrespective of actual work requirements and then to effect substantial and long term as opposed to short term or shortened week layoffs to bring staffing levels in the bindery into conformity with production needs.... On this record, given the close timing of the end of the balloting and the announcements of the layoffs to the employees as well as the burden of proof the General Counsel bears on each aspect of his prima facie case, it cannot be said that these decisions were made at a time when Respondent was obligated to bargain with the Union. Accordingly, I find that the layoffs initiated the week of the election were decided on by Respondent before it was obligated to bargain with the Union even though the employees were told of the layoffs and even though the layoffs did not actually begin until after the election.

*Id.* at 1067.

The Board cites no case law that suggests that *Consolidated Printers* and the case cited therein, *Embossing Printers*, are no longer valid. Instead, the Board has relied on the facts, arguing that they were insufficient to show that LWD's decision to lay off employees by forced ranking took place prior to the union election.[2] However, evidence to that effect could be found in the testimony of three LWD executives, the minutes of the November 25 LWD board meeting, and the fact that LWD's new president came from a compa-

---

**2.** In its brief, the Board states:

In support of its position, the Company refers to *Consolidated Printers*, 305 NLRB 1061, 1992 WL 5863 (1992), where the Board held that an employer who decided, prior to a representation election, to lay off certain employees did not violate Section 8(a)(5) by implementing that decision soon after the election. *Consolidated Printers, Inc.*, 305 NLRB 1061, 1067, 1992 WL 5863 (1992). We now show that the Company failed to demonstrate that the decision was actually made prior to the time that the Union demonstrated its majority support among employees.

NLRB br. at 24.

ny that had used forced ranking.[3]

In sum, the Board failed to distinguish or alter its own precedent, and all of the considerable available evidence supports the conclusion that LWD's actions were protected under *Consolidated Printers* and *Embossing Printers.* While we are concerned about the short time span between the decision to institute the forced ranking system, the election and the implementation of the forced ranking system, we decline to alter or distinguish the Board's precedent when no party has asked us to do so. We therefore hold that there was insufficient evidence in the record to support the Board's conclusion that the forced ranking system constituted an unlawful unilateral change in employment conditions. Thus, there was no duty to bargain over the use of the forced ranking system in the December 1997 and March 1998 layoffs.

## C. *Placement of Laid-off Workers in the General Labor Pool*

With respect to placing workers into a "general labor pool," the Board held that no good faith bargaining impasse could exist in light of the preexisting unfair labor practices involving forced ranking. Decision and Order, August 27, 2001 at *19. Thus, in finding a Section 8(a)(5) violation here, the Board relied on its holding that unfair labor practices existed, a holding that we now reverse.

If there are no pre-existing unfair labor practices, the Board uses a five-part test to determine if the parties bargained to a good faith impasse. "[T]he Board traditionally considers (a) the parties' bargaining history, (b) the parties' good faith in negotiations, (c) the length of the negotia-

tions, (d) the importance of the issues over which there is disagreement, and (e) the contemporaneous understanding of the parties as to the state of negotiations on the crucial date." *Intermountain Rural Elec. Ass'n v. N.L.R.B.,* 984 F.2d 1562, 1569 (10th Cir.1993) (citation omitted). Because we have reversed the Board's holding regarding the forced ranking system, we remand the dispute over the common labor pool to the Board for the standard analysis described in *Intermountain.*

## D. *The Discharge of William Jeffrey Walls*

Section 8(a)(3) of the NLRA bars employers from discriminating against an employee regarding hiring, firing, tenure or "any term or condition of employment" because of the employee's union membership and activities. 29 U.S.C. § 158(a)(3). To show a violation of Section 8(a)(3), the general counsel must first establish a *prima facie* case showing an unlawful motivating factor in the employer's decision. "Specifically, the general counsel must establish that (i) an individual was engaged in a protected activity, (ii) the employer was aware of the protected activity, and (iii) ... the employee's protected activity motivated the adverse treatment." *Kentucky Gen., Inc. v. N.L.R.B.,* 177 F.3d 430, 435 (6th Cir.1999). The factors to be considered to infer anti-union animus include "a company's expressed hostility towards unionization ..., knowledge of the employees' union activities, proximity in time between the employees' union activities and their discharges, the inconsistencies between the proffered reason and other actions of the employer, and disparate treatment of certain employees compared to

---

**3.** The Board argues that the record shows that LWD planned to hire additional people as of September 9. But this plan pre-dated some of LWD's difficulties and roughly coin-

cided with the switch in management. Thus, the plan to hire additional employees is irrelevant.

other employees with similar work records or offenses." *Id.* at 435–36 (quoting *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 375 n. 7 (6th Cir.1991)). "Circumstantial evidence alone is sufficient to create an inference of anti-union animus on the part of an employer." *Id.* at 436 (citation omitted).

Once the *prima facie* case is established, "the employer can rebut the inference only by demonstrating that it would have taken the adverse action notwithstanding the employee's protected activity." *Id.* (citation omitted). In particular, "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice." *W.F. Bolin Co. v. N.L.R.B.*, 70 F.3d 863, 870 (6th Cir.1995) (quoting *N.L.R.B. v. Transportation Mgmt. Corp.*, 462 U.S. 393, 397–98, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983)).

█ The Board's decision that the General Counsel established a *prima facie* case of discrimination is supported by substantial evidence. As the Board pointed out, "Walls supported the Union and was listed on Union fliers as a supporter." Decision and Order, August 27, 2001 at *19. His immediate supervisor knew of his Union support, as both Walls and the supervisor admitted that they argued about it when the supervisor spotted Walls distributing Union literature. Thus, the record establishes the employee's open advocacy and the employer's knowledge of such advocacy. The Board next considered the circumstantial evidence tending to prove anti-union motivation in Walls's discharge. In particular, the Board focused on the "timing [of Walls's discharge], three days before the Board certified the Union, and a week after the Union election," Decision and Order. August 27, 2001 at *19, and found the required "link" sufficiently established.

The record contains further evidence of LWD's anti-union bias. Five workers testified that they were interrogated by a senior operations supervisor about their union activities. The meetings were one-to-one and were conducted on the eve of the union election. In addition, prior to the union election and the meetings, LWD sent a letter to the employees urging them to vote in the upcoming union election, implying that their jobs depended on it.

The record also contains substantial evidence to support the Board's decision that LWD's proffered reason to discharge Walls was pretextual. The Board considered the Company's motive for discharging Walls—lack of work for him on the machine on which he was trained—and rejected it because LWD "stopped using the [machine] on a regular basis some months previously" and because of the "record as a whole." Decision and Order, August 27, 2001 at *19. There is no indication that Walls's performance was substandard.

### III

For the foregoing reasons, we **grant** LWD's petition to set aside and **deny** the Board's petition to enforce those portions of the order that pertain to LWD's duty to bargain over the forced ranking system in the December 1997 and March 1998 layoffs. We **grant** the Board's petition to enforce and **deny** LWD's petition to set aside those portions of the Board's order that pertain to William Walls' discharge. We **remand** to the Board the portion of the order concerning the duty to bargain over the placement of rehired workers in the common labor pool. We **grant** the Board's petition for enforcement of the remainder of its order and **deny** LWD's petition to set it aside.