Filed 1/12/15  County of Los Angeles v. Employee Relations Commission CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| COUNTY OF LOS ANGELES et al., | B244307 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS132903) |
| v. | |
| EMPLOYEE RELATIONS COMMISSION OF THE COUNTY OF LOS ANGELES, | |
| Defendant; | |
| ASSOCIATION OF DEPUTY DISTRICT ATTORNEYS, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Affirmed.

Gree & Shinee and Richard A. Shinee for Real Party in Interest and Appellant.

John F. Krattli, County Counsel, Joyce Aiello, Assistant County Counsel, Julie A. Silva, Principal Deputy County Counsel; Hausman & Sosa, Jeffrey M. Hausman, Larry D. Stratton; Ballard, Rosenberg, Golper & Savitt, Linda M. Savitt; Nassiri & Jung and John J. Manier for Plaintiffs and Respondents.

No appearance for Defendant.

_____

**INTRODUCTION**

Real party in interest Association of Deputy District Attorneys (ADDA) appeals from a judgment in favor of plaintiffs County of Los Angeles and the County's Office of the District Attorney, Chief Executive Office, and Department of Human Resources. The court issued a peremptory writ of administrative mandate commanding defendant Employee Relations Commission of the County of Los Angeles (ERCOM) to set aside its order prohibiting the District Attorney's Office (DAO) from making changes to the Deputy District Attorney (DDA) performance evaluation system, to enter a new order that the DAO and the County did not make the changes improperly, and to dismiss the ADDA's unfair practice charge.

ADDA first challenges the judgment on the ground the trial court did not have jurisdiction to rule on the petition for writ of administrative mandate because the petition was untimely under Government Code section 3509.5, subdivision (b). ADDA also challenges the judgment on the merits, arguing that the DAO implemented the new performance evaluation system after ADDA was certified as the collective bargaining unit for DDAs. Therefore, ADDA contends, it was an unfair practice for the DAO to implement the new system outside the collective bargaining process, and ERCOM properly ordered the DAO not to implement the system.

We hold that the trial court had jurisdiction to rule on the petition for writ of mandate because the limitations period set forth in Government Code section 3509.5,

2

subdivision (b), does not apply to judicial review of ERCOM decisions.  We further hold that, because the DAO made the decision to implement the new performance evaluation system prior to ADDA's certification as a bargaining unit, the DAO was not required to submit the new system to collective bargaining.  We therefore affirm the trial court's judgment ordering ERCOM to set aside its order prohibiting the DAO from implementing the new system.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *ADDA's Certification as a Bargaining Unit*

On January 12, 2006 ADDA filed a petition for certification of a collective bargaining unit consisting of all non-supervisory DDAs.  The County objected, and the matter was referred to ERCOM for a hearing.

ERCOM held hearings on March 29 and April 16, 2007.  On August 7, 2007 the hearing officer recommended that ERCOM find "that the petitioned for unit of DDAs is an appropriate unit for collective bargaining."  The County filed a written statement of exceptions on August 23.  ERCOM heard argument on the matter on September 24.  On October 22 ERCOM adopted the hearing officer's recommendation and ordered that ADDA was an appropriate unit for collective bargaining.  On March 24, 2008, after ADDA had presented valid authorization cards from a majority of the members of the proposed unit, ERCOM certified ADDA "as the exclusive representative for purposes of collective bargaining of Unit No. 801."

B. *The Performance Evaluation System*

For many years, the DAO, like other County departments, prepared performance evaluations using the County Human Resources Department's "Report of Performance Evaluation" form.  This was a paper form filled out by the reporting officers.  It provided check-off boxes for ratings ranging from "outstanding" to "unsatisfactory" in the five performance categories of "professional skills," "application to duties," "adaptability,"

3

"personal relations," and "supervisory ability." The form also provided space for comments. Supervisors reviewed employees annually, with the performance review period based on an employee's anniversary date.

In 2002 the County Board of Supervisors began looking at "ways to enhance the quality and productivity of the County workforce by, among other things, looking at new web-based methods to improve employee work performance." The Board adopted a County-Wide Strategic Plan, "an overall planning initiative" intended "to align the activities of all departments in one, overall county strategic direction." The plan "consists of goals, . . . strategies, objectives that apply across the county." Part of the County-Wide Strategic Plan was a performance evaluation system to accurately assess employee performance and tie performance to compensation. In the 2005 update to the Strategic Plan the Board set a strategy to reach the goal of workforce excellence: "By July 1, 2007 begin a phased implementation of the proposed countywide performance management system, designed to improve individual performance, and align employee job performance and work behaviors with County and/or departmental strategic objectives and values." One of the objectives for fulfilling this goal was to develop "a plan for implementing an automated, enterprise-wide performance management system" by September 30, 2005.

In April 2006 Chief Deputy District Attorney John K. Spillane established a management working committee to assist the DAO in reaching Strategic Plan goals. He appointed Pamela Booth, Director of the Bureau of Branch and Area Operations, Region II, to head the committee. The goal was to have the new performance management system in place by the end of 2006.

DAO management concluded that the old performance evaluation forms did not provide a reliable indicator of attorney performance because most DDAs routinely received a rating of "outstanding," which suggested that ratings were inflated. Management wanted more objective rating criteria in order "to honestly, fairly and correctly evaluate" DDAs' performance.

4

C.    *Implementation of the New Performance Evaluation System*

According to Spillane, implementation of the new performance evaluation system began in January 2007. At that time "[t]he work plans . . . which had been already created . . . began to be given out to the district attorneys." The performance evaluation tool was "substantially" in existence at that time. That same month Booth prepared a power point presentation that explained the new performance evaluation system to the raters and included the performance evaluation worksheet. Training sessions for the raters using the presentation were scheduled to begin in February 2007.[1]

On February 14, 2007 Spillane wrote to all DDAs regarding performance evaluations. He stated that "[a] new Performance Evaluation form for the 2007-2008 rating period has been developed in order to assist supervisors using the performance evaluation system to effectively and accurately rate *attorney* staff." After explaining the goals of the new system, he stated, "In order to make each of you aware of the performance expectations and new terminology used in the 2007-2008 Performance Evaluations, at the time the evaluation covering the 2006-2007 rating period is discussed with a deputy, each Rater will provide the deputy with a document entitled *Performance Work Plan*. . . . The *Performance Work Plan* provides guidelines of the objective behaviors a deputy should regularly manifest in order to meet the requirements and responsibilities for each assignment and for employment as a deputy district attorney. [¶] The office will continue to use the current Performance Evaluation form for all evaluations that will be issued in the 2007 calendar year. Beginning January 1, 2008, the office will employ the new Performance Evaluation document for all attorney staff to evaluate performance for the 2007-2008 rating period."

Booth wrote in a February 16, 2007 email that "Mr. Spillane has approved the final version of the Work Plan and Acknowledgment form," and attached copies so that the raters could create templates. The email again stated that the plan was for the raters

---

[1]    According to Spillane, "we began training the raters on the new performance evaluation system in 2007, and it continued on into 2008."

to discuss the forms during the 2006-2007 performance evaluations.  Lynn Vodden responded on February 21 that she would "create a template of the Work Plan and Acknowledgement [*sic*] Form and then distribute [it] electronically . . . .  We do not have a system yet to pre-populate these forms with the employee's information.  In order to get this off the ground we're going to have to implement as described above until a system is designed to produce the Work Plan as well as the new PE once it's finalized."  On February 22 Booth asked when the form would be available, noting "our immediate concern is to meet Mr. Spillane's time-table for getting the form out to the Raters by the end of this month . . . ."

One of the recipients of the emails, John Morris, wrote on April 17, 2007 that Spillane had "approved the Memorandum for Implementation of the Attorney Work Plan . . . and the instructions for implementing it."  Morris stated that, before DAO management could send out these documents, he needed a list of attorneys whose performance evaluations were due for the period of January 1 through April 20, 2007, and he needed staff to set up computer icons and email them to the raters.

On April 19, 2007 Spillane sent a memorandum to the district attorney, assistant district attorneys, and bureau directors regarding implementation of the new system.  He stated:  "Effective January 1, 2007, the office implemented a new Performance Evaluation system for attorneys.  This new program includes three new documents:  A Work Plan; an accompanying form showing acknowledgment of receipt of the Work Plan . . . ; and a new Performance Evaluation rating instrument."  Spillane explained that, "[i]n order to facilitate implementation," raters would complete and discuss the new forms with the attorneys during their 2006-2007 performance evaluations.  The Systems Division would send the raters computer icons containing templates of the work plan and acknowledgment form.

DDA Frank Tavelman was Senior Vice-President of ADDA in 2007 and 2008.  He stated that in June or July 2007 Booth met with the ADDA board of directors to explain the new performance evaluation system.  He remembered "her talking about the performance work plan and how it was going to be implemented."  Tavelman

remembered Booth talking "about timing, that it hadn't been implemented yet and it was a work in progress." Tavelman said the meeting was somewhat "heated." The board members "were expressing concerns about what was happening and the need for us to have some input because of the way that we believed this was going to affect D.A.'s [*sic*], given the limited knowledge that we had."

On June 21, 2007 the ADDA board voted to oppose the new performance evaluation system. On July 9, 2007 ADDA's president, Steve Ipsen, sent a letter to Booth stating ADDA's objections to the system. Tavelman sent Booth "more detailed concerns pertaining to the new Performance Work Plan ('PWP') and Performance Evaluation ('PE'). These comments are based on a discussion with the Board as well as DDAs who are already being subject to these new forms (although we were under the impression that implementation would not take place as of yet)."

Booth responded to Ipsen on August 17, 2007, stating that "[a]fter reading your letter, I am very concerned that I failed to effectively communicate several key elements of the revised system." She noted that "[t]he revised PE system is still in the process of being drafted. In fact, since the Board meeting, input has been solicited and received from a number of deputies, several of whom will be rated under the revised system, and significant changes have been made as a result of their comments." She further noted that she expected the worksheet used for evaluations would undergo adjustments for the next several years.

Booth responded to Tavelman on August 21, 2007, stating that then-Assistant District Attorney Jackie Lacey would attend the ADDA board meeting that evening to address his concerns. Booth said Lacey would "have two documents in the final draft phase that we hope to promulgate within the next several weeks that address several of the concerns expressed by the ADDA Board as well as some of the issues you raise . . . ." Booth also told Tavelman the "PE Worksheet" he requested was "not yet ready for distribution," but it would "be available to all deputies for review before the end of the year."

7

On November 12, 2007 Spillane wrote in his "View from the 18th Floor" newsletter that the DAO had announced in February 2007 "that significant revisions had been made to the Performance Evaluation (PE) system for attorney staff. Implementation of this revised PE will take effect in April of 2008. . . . Beginning in April of this year, the process was begun whereby each deputy will be provided a copy of the Performance Work Plan." Spillane noted that, "[i]n response to a number of excellent suggestions from deputies, the Work Plan has recently been revised. . . . It is anticipated that the Worksheet will continue to undergo consequential adjustments for the next several years in an effort to achieve the goals of fair, accurate and meaningful evaluations of attorney performance."

A series of emails between Booth and others in January and February 2008 shows that the DAO was still making revisions to the PE Work Plan. On February 26, 2008 Booth sent Spillane "the latest electronic version of the Workplan." She asked whether it was still going to debut in April, referring to problems with "the people in HR." The following day Booth emailed staff members that she "just confirmed with Mr. Spillane that we [are] good for launch on April 1 – April Fool's Day and all." She added that she was "really looking forward to testing the stuff out next week," and that work had started on the manual. On March 14, 2008 Booth explained, in response to a question about training, "Originally, the plan was to begin the new PE process in January of 2008. Because the Work Plan was not available until April, however, and the deputies who had PEs completed from January-March had not had a full year's notice of the criteria set in the Work Plan, we delayed the implementation of the new PEs until April (this was announced in LADAnet in December of 2007)."

D.      *ADDA's Challenge to Implementation of the New Performance
        Evaluation System*

On March 10, 2008 John Harrold, Chairman of ADDA's Labor Committee, wrote to then-District Attorney Steve Cooley stating that on March 24 ERCOM would formally recognize ADDA as the certified bargaining unit for all Los Angeles DDAs. "It is the

8

position of the ADDA that this Administration's decision to implement any significant alteration or modification of employee/employer relations during this time of unionization would constitute an unfair labor practice unless submitted to the bargaining unit for negotiation. Changing the status of employer/employee relations while clear efforts aimed at unionization are underway is considered inimical to constitutionally protected rights of association. It is our belief the new Performance Evaluation significantly alters employer/employee relations, and as such should not be implemented, if at all, until after your administration meets and confers with authorized representatives of the ADDA and an agreement is reached."

On March 26, 2008 Spillane wrote a letter on behalf of Steve Cooley reminding Harrold that the new performance evaluation system had been announced on February 14, 2007, Booth had met with ADDA concerning the new plan, and the Performance Evaluation Revision Committee had accepted many of ADDA's suggestions. Spillane recounted that "[t]he Implementation of the new forms was delayed from January 1, 2008 to April 1, 2008 to allow all Deputy District Attorneys to receive a Performance Work Plan well in advance of receiving the new performance evaluation." Spillane told ADDA, "[t]he Department will be implementing the new performance evaluation forms on April 1, 2008."

Harrold testified, however, that "[n]o one from the District Attorney's Office . . . ever responded to me." The only response he received was from Donald L. Washington, Manager and CEO/Employee Relations with the County's Chief Executive Office. Washington wrote on April 24, 2008 that "the Chief Executive Office/Employee Relations Division is responsible for conducting contract negotiations for newly established bargaining units . . . ." He invited Harrold to contact him "so that we can schedule a meeting to discuss the issues you raised regarding the 'proposed new performance evaluation form.'" Washington also suggested that Harrold consult ADDA's board of directors "regarding the commencement of formal negotiations for a new Memorandum of Understanding for Deputy District Attorneys."

9

On August 21, 2008 ADDA filed a formal unfair labor practices charge with ERCOM. ADDA filed amended charges on August 27 and September 24, 2008. ADDA alleged that it was certified as a bargaining unit on March 24, 2008. The DAO subsequently "unilaterally modified the existing employer/employee relationship without properly meeting and conferring, as well as negotiating with the ADDA on the changes." "The management of the District Attorney's Office was aware of the ADDA's efforts to certify for the past several years," and those efforts "predate[d] the management's commencement of it[s] modification of the existing performance evaluation . . . ."

ADDA alleged that the new performance evaluation system "was, by admission, not implemented until sometime after April 1, 2008, **subsequent** to the ERCOM declaration establishing the ADDA as a bargaining unit . . . ." The DAO's "ongoing effort to alter or change the employer/employee relationship during the ADDA's effort to certify and afterward is an unfair labor practice, and the County's refusal to intervene," despite ADDA's requests that it do so, "is an ongoing offense." ADDA requested that ERCOM order the DAO to cease and desist from implementing the new performance evaluation system and to rescind any evaluations made using the new system.

On February 26, 2009 ERCOM appointed a hearing officer to hear the matter. The hearing officer conducted hearings in late 2009 and early 2010, and issued a report on August 19, 2010. The hearing officer concluded that the DAO, "through PERSA [the new Performance Evaluation Review Systems for Attorneys], made material changes to the existing DDA I-IV performance evaluation system set forth in [Civil Service Rule] 20.04 without notice to or opportunity for the Charging Party to bargain." The hearing officer also found that "PERSA had not been fully implemented at the time the ADDA became certified and demanded to bargain." The hearing officer concluded that the matter was "clearly negotiable as it implicates or relates to unit employees' wages, hours, and working conditions within the scope of bargaining. The County thus has a duty to negotiate with Charging Party on the effects of P.E. Rule changes and its failure and refusal to do so violates [Employee Relations] Ordinance Sections 12(a)(1) and 12(a)(3). [¶] Once its duty to bargain arose, the County also failed to provide the ADDA with

10

relevant requested information necessary to meet and confer and thereby violated Sections 12(a)(1), 12(a)(3) and 15 of the Ordinance." The hearing officer also found that the DAO's actions were not motivated by anti-union animus.

The hearing officer recommended that ERCOM order the DAO to "[r]escind the PERSA system changes and restore the status quo ante to DDA I-IV employee performance evaluations as they existed prior to April 1, 2008." He further recommended that ERCOM order the DAO not to make any changes to the performance evaluation system without first bargaining with ADDA.

The DAO filed exceptions to the hearing officer's report. The DAO argued that the hearing officer had no authority to rule on the DAO's compliance with Civil Service Rules and, in any event, the change to the performance evaluation system did not violate Civil Service Rules. The DAO also argued that the change to the performance evaluation system did not have any adverse impact and thus did not violate the Employee Relations Ordinance. The DAO also asserted that the hearing officer's recommendation that the DAO restore the status quo ante was ambiguous and would "unwind" the entire performance evaluation system. ADDA responded to the DAO's exceptions, and the parties argued the matter before ERCOM.

ERCOM issued its decision adopting the hearing officer's report and recommendations in their entirety. ERCOM ordered the DAO to "cease and desist from making changes to the DDA I-IV performance evaluation system and Civil Service Rules ("CSR") pertaining thereto, including but not limited to CSR 20, without first negotiating with the ADDA."

The County, the Chief Executive Office, and the Department of Human Resources filed a motion for reconsideration. ADDA filed an opposition arguing, among other things, that the County, the Chief Executive Office, and the Department of Human Resources were improperly seeking to intervene in the action. ERCOM denied the motion for reconsideration and affirmed its previous decision.

11

E.    *Mandate Proceedings*

On July 12, 2011 the County, the Chief Executive Office, the Department of Human Resources, and the DAO (collectively, the County) filed a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5), writ of mandate (*id.*, § 1085), and complaint for declaratory relief (*id.*, § 526, subd. (a)).  ADDA sought an order directing the DAO to comply with ERCOM's final order in the absence of a stay, and the County filed a cross-motion to stay enforcement of ERCOM's order.  In support of the County's motion to stay, Booth submitted a declaration explaining the difficulty and unfairness of undoing the ratings given under the new performance evaluation system and returning to the old system.  The trial court granted the County's motion for a stay, finding that a stay of the proceedings was in the public's best interest, and it denied as moot ADDA's request for an order requiring the DAO to comply immediately with ERCOM's decision.

The trial court heard the matter on July 27, 2012 and issued a ruling on July 30.  The court first addressed the issue whether the DAO was required to negotiate with ADDA.  The court noted the DAO's position "that the revised performance evaluation system was implemented no later than the beginning of the 2007-2008 rating period in April 2007," although "the use of the new forms was delayed" until "April 1, 2008 so that all DDAs had received a Performance Work Plan by the time the new evaluations were given."  The court also noted ADDA's position "that the lynchpin [*sic*] of the revised evaluation system was the PERSA Data Sheet—the computer interface used as a rating tool for the new performance evaluation system.  Unless and until that form was completely settled and finalized, the Performance Evaluation System was not 'implemented.'"  The court recognized that, according to ADDA, the new performance evaluation system was not implemented until after April 1, 2008.

In the trial court's view, the fact that the DAO was still revising and disseminating certain aspects of the new performance evaluation system did not constitute substantial evidence that the DOA had not implemented the system.  "The relevant inquiry is not whether there are rating documents and the computer interface documents that will be revised," because such documents are always subject to revision.  Rather, "the relevant

12

inquiry requires ERCOM to ask whether the revised personnel system was underway in a way and to a degree whereby there would have been no alteration to the system even if collectively bargained. The uncontroverted evidence in the record demonstrates that the system was in place, that deputy DAs were being evaluated using new work plans and new measures of performance and that there was nothing meaningful to discuss at the time the ADDA was certified. That rating forms required to generate data were incomplete does not constitute substantial, relevant evidence that the revised system was not fully [implemented] before March 24, 2008."

The trial court found that "[i]mplementation of a revised personnel system occurs at the beginning of the rating period—when the new Work plan is issued to rated employees—not at the end when the PEs are finally issued." Because this occurred before ADDA was certified as a bargaining unit, the DAO "did not have a statutory obligation to negotiate pursuant to LA County Code sections 5.04.030 and 5.04.240." The court added that ERCOM had no jurisdiction over actions taken before ADDA's certification. Therefore, ERCOM's "decision finding an unfair employee relations practice against [the DAO] for failing to bargain with . . . ADDA is an abuse of discretion because such a conclusion is not supported by substantial evidence . . . ."

The trial court also addressed the petitioners' argument that ERCOM erred as a matter of law in concluding that the DAO had a duty to bargain under the balancing test in *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, which sets forth the factors that an employer must consider in determining whether a management action is subject to collective bargaining. Under *Claremont*, the trial court stated, the question is "whether, as a matter of law, the revised personnel system had a 'significant and adverse effect on the . . . working conditions' of represented district attorneys." The court concluded that the revised system did have such an effect because, under the new system, far fewer DDAs received the highest rating. The new "performance evaluation system would have far-reaching consequences, affecting job security, specialty assignments, promotional opportunities, merit pay increases, step-

13

salary increases; disciplinary consequences, and appraisal of promotion and layoff issues."

The trial court noted, however, that *Claremont* "mandates two additional inquiries—neither of which appear[s] to have been considered by ERCOM. [¶] ERCOM failed to consider whether the significant and adverse effects associated with the revised PE system arose from the implementation of a fundamental managerial or policy decision. In addition, ERCOM failed to balance the employer's need for unencumbered decision-making in managing its operations against the benefit to employer-employee relations of bargaining about the change to the performance evaluation system." By failing to perform the entire *Claremont* analysis, the court concluded, ERCOM "failed to proceed in a manner required by law." For that reason, ERCOM's conclusion that the DAO's failure to bargain constituted an unfair labor practice "was erroneous as a matter of law."

The trial court entered judgment on August 13, 2012. The court issued a writ of administrative mandate commanding ERCOM to set aside its decision and to enter a new and different decision that the DAO did not violate the Employee Relations Ordinances or Civil Service Rules, and dismissing ADDA's unfair labor practice charge with prejudice. ADDA timely appealed.

## DISCUSSION

A. *The Superior Court Had Subject Matter Jurisdiction*

ADDA first contends that the superior court lacked subject matter jurisdiction over this case because under Government Code section 3509.5, subdivision (b),[2] the Court of Appeal has jurisdiction over a challenge to a decision by ERCOM, and the County failed to file the petition for writ of administrative mandate within the 30-day time limit

---

[2] Unless otherwise specified, all further section references are to the Government Code.

14

prescribed by section 3509.5, subdivision (b).  The County argues that section 3509.5 does not apply to a writ petition challenging a decision by ERCOM.  Whether section 3509.5, subdivision (b), applies to decisions by ERCOM is a matter of statutory interpretation involving several statutes and the contexts in which the Legislature enacted them.

### 1. The Meyers-Milias-Brown Act and Section 3509.5

"In 1961, the Legislature enacted the George Brown Act (Stats. 1961, ch. 1964, § 1, pp. 4141-4143, adding Gov. Code, § 3500 et seq.), which granted public employees in California the right to organize and have their representatives 'meet and confer' with their employers over wages and working conditions [citation].  That right was expanded in 1968, when the Legislature enacted the [Meyers-Milias-Brown Act (MMBA)] (Gov. Code, §§ 3500-3510) authorizing public entities and labor representatives not only to confer but also to reach binding agreements on wages, hours, and working conditions. [Citations.]" (*City of San Jose v. Operating Engineers Local Union No.3* (2010) 49 Cal.4th 597, 603; see *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077, 1084.)

The history of the Public Employment Relations Board (PERB) began "in 1975, when the Legislature enacted the Educational Employment Relations Act (EERA) (. . . §§ 3540-3549.3).  That law established the Educational Employment Relations Board (EERB), which in 1977 was renamed the Public Employment Relations Board." (*City of San Jose v. Operating Engineers Local Union No.3*, *supra*, 49 Cal.4th at pp. 603-604, citing *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.*, *supra*, 35 Cal.4th at p. 1085.)  Section 3541.5 gave PERB jurisdiction over charges of unfair labor practices.  (*City of San Jose*, *supra*, at p. 604.)

"In 2000, the Legislature extended PERB's jurisdiction to cover matters arising under the MMBA—this was done through enactment of . . . section 3509, which became effective July 1, 2001.  (Stats. 2000, ch. 901, § 8.)" (*City of San Jose v. Operating Engineers Local Union No.3*, *supra*, 49 Cal.4th at p. 605.)  Section 3509, subdivision (a),

15

provides:  "The powers and duties of the board described in Section 3541.3 [of the EERA] shall also apply, as appropriate, to this chapter . . . ."  Section 3501, subdivision (f), specifies that, as used in the MMBA, "'[b]oard means the Public Employment Relations Board established pursuant to Section 3541."

With respect to local agencies, the MMBA provides in section 3507, subdivision (a), that "[a] public agency may adopt reasonable rules and regulations after consultation in good faith with representatives of a recognized employee organization or organizations for the administration of employer-employee relations under this chapter."  Subdivision (d) of section 3507 provides:  "Employees and employee organizations shall be able to challenge a rule or regulation of a public agency as a violation of this chapter.  This subdivision shall not be construed to restrict or expand the board's jurisdiction or authority as set forth in subdivisions (a) to (c), inclusive, of Section 3509."  Subdivisions (a) to (c) of section 3509 provide that PERB's powers and duties extend to the MMBA, "[a] complaint alleging any violation of this chapter or of any rules and regulations adopted by a public agency pursuant to Section 3507 or 3507.5 shall be processed as an unfair practice charge by the board," and "[t]he board shall enforce and apply rules adopted by a public agency concerning unit determinations, representation, recognition, and elections."  Subdivision (d) of section 3509 provides:  "Notwithstanding subdivisions (a) to (c), inclusive, the employee relations commissions established by, and in effect for, the County of Los Angeles and the City of Los Angeles pursuant to Section 3507 shall have the power and responsibility to take actions on recognition, unit determinations, elections, and all unfair practices, and to issue determinations and orders as the employee relations commissions deem necessary, consistent with and pursuant to the policies of this chapter."

The Legislature enacted Section 3509.5 in 2002 "to establish procedures for judicial review of determinations by the Public Employment Relations Board."  (Stats. 2002, ch. 1137, § 1(c).)  Subdivision (a) of section 3509.5 provides that any party "aggrieved by a final decision or order of the board in an unfair practice case . . . may petition for a writ of extraordinary relief from that decision or order."  Subdivision (b) of

16

that section provides that "[a] petition for a writ of extraordinary relief shall be filed in the district court of appeal having jurisdiction over the county where the events giving rise to the decision or order occurred. The petition shall be filed within 30 days from the date of the issuance of the board's final decision or order, or order denying reconsideration, as applicable. . . ."

### 2. ERCOM

"In the same year the MMBA was enacted, the County passed its own ordinance conforming to the legislative policies expressed in the MMBA. [Citation.] The ordinance created ERCOM to administer its provisions. [Citations.] In giving PERB jurisdiction over MMBA disputes, the Legislature made an express exception for ERCOM. Section 3509, subdivision (d) states that, notwithstanding PERB's jurisdiction to administer the MMBA, ERCOM retains the power to consider and resolve employment relations matters 'consistent with and pursuant to the policies of this chapter.' Allegations of unfair labor practices by the County must be brought to ERCOM, not PERB. In essence, ERCOM is a separate agency empowered to resolve public employment labor disputes in Los Angeles County just as PERB does for all other counties in California. [¶] ERCOM must exercise its authority in a manner 'consistent with and pursuant to' the policies of the MMBA as interpreted and administered by PERB. [Citation.]" (*County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 916-917.)

ERCOM is governed by chapter 5.04 of title 5 of the Los Angeles County Code of Ordinances, "known as the 'employee relations ordinance of the county of Los Angeles'" (ERO). (ERO § 5.04.010.) The purpose of the ERO was to establish public policy with respect to labor relations, including "A. Recognizing and defining the rights of employees to join organizations of their own choosing for the purpose of representation on matters affecting employee relations or to represent themselves individually in dealing with the county; [¶] B. Establishing formal rules and procedures to provide for the orderly and systematic presentation, consideration and resolution of employee relations

17

matters; and [¶] C. Creating an independent employee relations commission to ensure that all county employees and their representatives are fairly treated, that their rights are maintained, and that their requests are fairly heard, considered and resolved." (ERO § 5.04.020.) The provisions of the ERO were "not intended to conflict with the provisions of Chapter 10, Division 4, Title 1 of the Government Code of the state of California (Sections 3500 et seq.) as amended in 1968 [i.e., the MMBA]." (ERO § 5.04.040, subd. E.)

The ERO provided for the continued existence of ERCOM to "implement and administer the provisions of this chapter." (ERO § 5.04.100, subd. A.) Among the powers the ERO granted to ERCOM is the power "[t]o investigate charges of unfair employee relations practices or violations of this chapter, and to take such action as the commission deems necessary to effectuate the policies of this chapter . . . ." (*Id*., § 5.04.160, subd. E.) The ERO further provides that ERCOM "is a separate agency of the county and is authorized, following notice and hearing, to adopt reasonable rules and procedures not inconsistent with the provisions of Ordinance 9646 [which enacted the ERO] or any other county ordinance and which are necessary in the performance of its duties under this chapter." (*Id*., § 5.04.170.)

Under the ERO, "If [ERCOM] decides that the county has engaged in an unfair employee relations practice or had otherwise violated this chapter or any rule or regulation issued thereunder, the commission shall direct the county to take appropriate corrective action. [¶] 1. Such order shall be binding on the county, unless it requires action by the board of supervisors to make appropriations adjustments, transfers or revisions as provided by Section 29000 et seq. of the Government Code, or the adoption of a county ordinance by the board of supervisors. If the county fails to take action to comply with a binding order of [ERCOM] within such reasonable time as [ERCOM] may specify, an aggrieved party may petition the Superior Court for a writ of mandate to enforce the order." (ERO § 5.04.240, subd. E1.) If action by the board of supervisors is required and the board of supervisors "does not take action within such reasonable time as [ERCOM] may specify, [ERCOM] shall so notify the other parties. An aggrieved

18

party may then seek judicial relief from the Superior Court for enforcement of [ERCOM]'s order to the extent that compliance with such order is required by state law, or by this chapter or any valid rule or regulation issued thereunder. Notwithstanding the failure of the board of supervisors to take such action, the Superior Court shall have jurisdiction to exercise its independent judgment on the evidence in light of the whole record and in its discretion to take additional evidence and to issue a writ of mandamus enforcing [ERCOM]'s order on a finding by the Superior Court that the county has committed an unfair employee relations practice in violation of state law, or this chapter." (*Id*., subd. E2.)

### 3. Rules of Statutory Construction To Interpret Section 3509.5

In determining whether section 3509.5 applies to decisions by ERCOM "'[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent.' [Citation.] 'In construing statutes, we aim "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law."' [Citation.] California courts 'have established a process of statutory interpretation to determine legislative intent that may involve up to three steps.' [Citation.] The 'key to statutory interpretation is applying the rules of statutory construction in their proper sequence . . . as follows: "we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction."' [Citation.]" (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1396-1397; accord, *Busse v. United PanAm Financial Corp.* (2014) 222 Cal.App.4th 1028, 1038.)

The first step in our inquiry is to examine the words of the statute themselves, "'because the statutory language is generally the most reliable indicator of legislative intent.'" (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77; *Mt. Hawley Ins. Co. v. Lopez*, *supra*, 215 Cal.App.4th at p. 1397.) "'If the interpretive question is not resolved in the first step, we proceed to the second step of the inquiry. [Citation.] In this step, courts may "turn to secondary rules of interpretation, such as maxims of

19

construction, 'which serve as aids in the sense that they express familiar insights about conventional language usage.'" [Citation.] We may also look to the legislative history. [Citation.] "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." [Citation.] [¶] "If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply 'reason, practicality, and common sense to the language at hand.' [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, '[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." [Citation.]' [Citation.] These 'other matters' can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason—'to *effectuate the purpose* of the law.'"' [Citations.]" (*Mt. Hawley Ins. Co.*, *supra*, at p. 1397.)

Finally, even if the meaning of the words in a statute is clear, it may be necessary to engage in the second and third steps of the inquiry where the context of the statute reveals a latent ambiguity. "A latent ambiguity exists when a literal interpretation of a statute would frustrate the purpose of the statute. [Citation.] When faced with a latent ambiguity, we must determine which interpretation of the statute is most consistent with the legislative intent. We infer that the Legislature intended an interpretation producing practical, workable results, not one producing mischief or absurdity. [Citation.]" (*People v. Childs* (2013) 220 Cal.App.4th 1079, 1101.) We may then "'"look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part'" in order to determine its meaning. (*People v. Leiva* (2013) 56 Cal.4th 498, 510.)

20

#### 4. Analysis

As noted, section 3509.5, subdivision (a), provides that any party "aggrieved by a final decision or order of the board in an unfair practice case . . . may petition for a writ of extraordinary relief from that decision or order." Both subdivision (b) of that section, which requires the aggrieved party to file the petition in the Court of Appeal, and subdivision (c) of that section, which governs enforcement of final decisions and orders, also refer to the "board." Section 3501, subdivision (f), specifies that, as used in the MMBA, "'[b]oard' means the Public Employment Relations Board established pursuant to Section 3541." This language is clear and unambiguous: the references to the "board" in section 3509.5 are to PERB, not to ERCOM.

ADDA's argument, in essence, is that the reference to ERCOM in section 3509 creates a latent ambiguity in section 3509.5. Section 3509, subdivision (d), provides ERCOM "shall have the power and responsibility to take actions on recognition, unit determinations, elections, and all unfair practices, and to issue determinations and orders as the employee relations commissions deem necessary, *consistent with and pursuant to the policies of this chapter*." (Italics added.) ADDA argues that the italicized portion of this section means that ERCOM is bound by the provisions of section 3509.5.

In support of its argument, ADDA relies on *Singletary v. International Brotherhood of Electrical Workers, Local 18* (2012) 212 Cal.App.4th 34. In *Singletary*, the superior court dismissed an action under the MMBA, finding that under Government Code section 3509, subdivision (d), the Employee Relations Board of the City of Los Angeles (ERB)[3] had exclusive jurisdiction over the labor dispute. (*Singletary*, *supra*, at p. 37.) The Court of Appeal explained, "In 2000, the Legislature extended PERB's jurisdiction to cover matters arising under the MMBA through enactment of section 3509, which became effective July 1, 2001. (Stats. 2000, ch. 901, § 8, p. 6607.) Section 3509, subdivision (b) now provides in relevant part that 'The initial

---

[3] The exceptions to PERB jurisdiction in subdivision (d) of section 3509 include both ERCOM and ERB.

21

determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of [PERB] . . . .'  The legislature recognized that the MMBA had 'no effective enforcement procedures except for court action, which is time-consuming and expensive.  One of the basic principles of an effective collective bargaining law should be to provide for enforcement by an administrative agency with expertise in labor relations.  The appropriate role for the courts is to serve as an appellate body.'  (Assem. Com. on Appropriations Analysis of Sen. Bill No. 739 (1999–2000 Reg. Sess.) as amended June 6, 2000, p. 2.)  These changes had the effect of removing from the courts their initial jurisdiction over MMBA unfair practice charges.  [Citation.]

"As a result, section 3509, subdivision (b) provides, '[a] complaint alleging any violation of [the MMBA] . . . shall be processed as an unfair practice charge by [PERB]. The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of [PERB] . . . .'  This enactment removed 'from the courts their initial jurisdiction over MMBA unfair practice charges' and vested such jurisdiction in PERB.  [Citation.]  [¶]  Thus, PERB has exclusive initial jurisdiction to determine an unfair practice charge.  [Citation.]"  (*Singletary v. International Brotherhood of Electrical Workers, Local 18*, *supra*, 212 Cal.App.4th at pp. 42-43.)

The court noted that ERB was created "before PERB, and thus the MMBA carved out an exception for ERB" under section 3509, subdivision (d).  (*Singletary v. International Brotherhood of Electrical Workers, Local 18*, *supra*, 212 Cal.App.4th at p. 43.)  Section 3507, subdivision (a), authorized the City of Los Angeles to adopt rules and regulations implementing the MMBA, and the City did so.  The City's ERO expressly granted ERB the power to resolve labor issues such as the one involved in *Singletary*.  (*Singletary*, *supra*, at p. 44.)

The *Singletary* court found that the plaintiffs' interpretation of section 3509, subdivision (d), that an unfair labor practice charge can be filed in the superior court in the first instance, "would nullify the stated legislative purpose of providing primary

22

jurisdiction in personnel boards for review of violations of the MMBA. Given that the City's ERB was created in 1971, before the establishment of PERB in 1975, when the Legislature acted in 2000 to expressly specify the means of review of decisions of PERB, the Legislature did not want to appear to nullify the powers of ERB. Consistent with this purpose, the word '[n]otwithstanding' that prefaces subdivision (d) of section 3509 does not operate to exempt ERB from the review provisions of section 3509, but is merely a recognition of ERB's continued autonomy as an employee relations board. This fact is recognized in the closing clause of subdivision (d), which states that ERB has the power to 'issue determinations and orders as the employee relations commissions deem necessary, *consistent with and pursuant to the policies of this chapter*.' (§ 3509, subd. (d) (italics added).) Thus, the provisions of section 3509, subdivisions (a) through (c), to the extent they delimit the jurisdiction of the courts vis-à-vis review of the actions of employee relations boards, apply equally to ERB except that those sections do nothing in derogation of ERB's powers." (*Singletary v. International Brotherhood of Electrical Workers, Local 18*, *supra*, 212 Cal.App.4th at p. 46.)

The *Singletary* court then added, "For this reason, even if plaintiffs had exhausted their administrative remedies by pursuing their claims before ERB, plaintiffs could not have commenced their action in superior court to challenge ERB's ruling. Instead, pursuant to section 3509.5, subdivisions (b) and (c), they were required to commence a writ petition in the Court of Appeal within 30 days of the adverse decision. As a result, the trial court did not err in dismissing the action for lack of jurisdiction." (*Singletary v. International Brotherhood of Electrical Workers, Local 18*, *supra*, 212 Cal.App.4th at p. 46, fn. omitted.)

In *Singletary*, the primary issue was whether ERB had exclusive initial jurisdiction over the labor relations issue involved. It does not appear that the parties questioned the applicability of section 3509.5, and thus the court did not analyze the issue. The only case cited by the court on the issue, *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 271, involved PERB, which clearly is subject to section 3509.5. The *Singletary* court's assumption that section

23

3509.5 applied to ERB—and by analogy to ERCOM—was unnecessary to its decision and, in our opinion, not entirely correct.

In other cases, parties have raised challenges to decisions by ERB first in the superior court, both before and after the enactment of section 3509.5. (See, e.g., *County of Los Angeles v. Los Angeles County Employee Relations Com.*, *supra*, 56 Cal.4th at p. 914; *Mariscal v. Los Angeles City Employee Relations Bd.* (2010) 187 Cal.App.4th 164, 169, 173; *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 5-6.) "'The Legislature, of course, is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof.' [Citation.]" (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1056; see *Busse v. United PanAm Financial Corp.*, *supra*, 222 Cal.App.4th at p. 1038 ["the Legislature is 'presumed to know about existing case law when it enacts or amends a statute'"]; *Borikas v. Alameda Unified School Dist.* (2013) 214 Cal.App.4th 135, 150 ["the Legislature is deemed to be aware of existing law"].) As *Singletary* recognizes, the Legislature was aware of the existence of ERB when it "carved out an exception for ERB" under section 3509, subdivision (d). (*Singletary v. International Brotherhood of Electrical Workers, Local 18*, *supra*, 212 Cal.App.4th at p. 43.)

We must similarly deem the Legislature to have been aware of ERB and the existence of challenges to its decisions in the superior court when it enacted section 3509.5,[4] yet it made no mention of ERB in that section but referred only to PERB. We also may presume that by omitting reference to ERB in section 3509.5, the Legislature did not intend that section 3509.5 apply to ERB. (See *Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1201 ["[t]hat the Legislature chose to omit references to 'local laws' when drafting [Labor Code] section 1102.5 is readily apparent from its inclusion of 'local laws' in the language of other whistleblower statutes"; this omission "is indicative

---

**4**     The legislative history of section 3509, which we discuss below, confirms the Legislature's awareness of challenges to ERB decisions in the superior and municipal courts.

24

of legislative intent to exclude such laws from the purview of [Labor Code] section 1102.5"]; *Levin v. United Airlines* (2008) 158 Cal.App.4th 1002, 1022 [because the Legislature omitted language from a statute that was similar to the same language used in other statutes, the court cannot read that language into the statute]; see also *Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289, 309 ["[w]e presume that the Legislature, when omitting any language providing for modification of the denial of visitation under [Family Code] section 3101, was aware that other statutes on visitation and custody specifically granted the courts with discretion to modify these orders and therefore did not intend for a stepparent to be able to request a modification of the denial of visitation under [Family Code] section 3101"].)  A statute "'is to be interpreted by the language in which it is written, and courts are no more at liberty to add provisions to what is therein declared in definite language than they are to disregard any of its express provisions.' [Citation.]" (*Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1097; accord, *Von Nothdurft v. Steck* (2014) 227 Cal.App.4th 524, 533-534; *Chalmers*, *supra*, at p. 309; see also Code Civ. Proc., § 1858 ["[i]n the construction of a statute" a court "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted"].)  The conclusion that section 3509.5 applies only to decisions by PERB is buttressed by the Legislature's stated intent in enacting the section, "to establish procedures for judicial review of determinations by the Public Employment Relations Board." (Stats. 2002, ch. 1137, § 1(c).)

The language of section 3509, subdivision (d), relied on by ADDA, does not compel a different conclusion.  That section refers to ERB's power to take action "consistent with and pursuant to the policies of this chapter."  It says nothing about judicial power to review ERB's decisions.

ADDA argues that, if section 3509.5 does not apply to decisions by ERB and ERCOM, "the legislative intent with regard to [sections] 3509 and 3509.5 would be frustrated.  Rather than having a uniform system of labor relations governed by PERB and the principles set forth in [the MMBA], local superior courts throughout the State of California would be second guessing both PERB and institutions such as ERB and

25

ERCOM." This argument overlooks the fact that section 3509.5 applies to all decisions by PERB, throughout the state. The only exceptions to section 3509.5 are ERB and ERCOM, the only two local labor relations commissions for public employees recognized in section 3509, both located in Los Angeles County.

ADDA also relies on the principle, expressed in *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.*, *supra*, 35 Cal.4th 1072, that "we do not construe statutes in isolation; rather, we construe every statute with reference to the whole system of law of which it is a part, so that all may be harmonized and anomalies avoided. [Citations.] The MMBA, which we construe here, is part of a larger system of law for the regulation of public employment relations under the initial jurisdiction of the PERB. The PERB suggests no way in which MMBA unfair practice charges differ from unfair practice charges under the other six public employment relations laws within the PERB's jurisdiction . . . so as to justify a limitations period that is *six times longer* than the six months allowed under each of these other laws. The PERB suggests no rational ground upon which the Legislature could have decided to treat MMBA unfair practices charges so differently in regard to the limitations period. We find it reasonable to infer that the Legislature intended no such anomaly, and that it intended, rather, a coherent and harmonious system of public employment relations laws in which all unfair practice charges filed with the PERB are subject to the same six-month limitations period." (*Id*. at pp. 1089-1090.) From this general principle, ADDA argues that all public employment relations laws "have identical language directing the appeal be filed with the Court of Appeal," and "[it] would not harmonize and it would be anomalous to except from all seven statutory schemes ERCOM and ERB from the method of appeal articulated by the Legislature."

*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.*, *supra*, 35 Cal.4th 1072 addressed "a larger system of law for the regulation of public employment relations *under the initial jurisdiction of the PERB*." (*Id*. at p. 1089, italics added.) Cases before ERB and ERCOM are not "under the initial jurisdiction of the PERB." The statutes cited by ADDA that direct parties to file appeals

of the decisions regarding public employment relations with the Court of Appeal refer to decisions by the "board," which those statutes define as PERB. (See §§ 3540.1, subd. (a), 3562, subd. (b), 71639.1, subd. (a), 71825, subd. (a); Pub. Util. Code, § 99560.1, subd. (b)).

The legislative history of section 3509 is consistent with the conclusion that section 3509.5 applies only to PERB. The County points out that Senate Bill No. 739, which ultimately became section 3509, at one point provided in subdivision (d) that "[a]ny judicial review applicable to a superior court or municipal court shall be filed directly with the Court of Appeal." (Assem. Amend. to Sen. Bill No. 739 (1999-2000 Reg. Sess.) Aug. 16, 1999.) The Legislature subsequently omitted this language. (Assem. Amend. to Sen. Bill No. 739 (1999-2000 Reg. Sess.) June 6, 2000.) Legislative history showing that the Legislature considered and rejected language requiring judicial review of ERB and ERCOM decisions in the Court of Appeal "'preclud[es] judicial construction to the contrary.'" (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 126; see *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 590-591 ["'Legislature's rejection of specific language constitutes persuasive evidence a statute should not be interpreted to include the omitted language'"].)

The Legislature evidenced its intent to allow continued judicial review of ERB and ERCOM decisions by the superior court when it enacted section 3509. We may presume this remained the intent of the Legislature when it failed to include ERB and ERCOM in section 3509.5 when it limited judicial review of PERB decisions. (See *Little Co. of Mary Hospital v. Superior Court* (2008) 162 Cal.App.4th 261, 269-270 [effect of omission of limiting language in new statute]; *Hall v. Hall* (1990) 222 Cal.App.3d 578, 587, fn. 2 [we "'assume[] that the legislature, in enacting or amending a statute, knew of existing laws, that it was familiar with the common-law rules and the acts of previous legislatures, that it had knowledge of existing judicial decisions construing the same or related statutes and enacted new statutes and amendments or reenacted statutes in the light thereof, and that its intent was to maintain a consistent body of rules'"].) "Thus, the

27

legislative history supports our conclusion based on the plain language of the statutes." (*Toyota Motor Corp. v. Superior Court* (2011) 197 Cal.App.4th 1107, 1122.)

We conclude that section 3509.5 applies to decisions by PERB only, not to decisions by ERB or ERCOM. Therefore the superior court had jurisdiction to review ERCOM's decision in this case.

B.      *ERCOM's Decision Was Erroneous as a Matter of Law*

1.      Standard of Review

"Code of Civil Procedure section 1094.5 governs judicial review of a . . . decision by an administrative agency if the law required a hearing, the taking of evidence, and the discretionary determination of facts by the agency. (*Id.,* subd. (a).) The petitioner must show that the agency acted without or in excess of jurisdiction, did not afford a fair trial, or prejudicially abused its discretion. (*Id.,* subd. (b).) An abuse of discretion is shown if the agency did not proceed in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence. (*Ibid.*)" (*Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 98-99.)

Where, as here, a fundamental vested right is not involved, we review the administrative agency's decision, not the trial court's decision. (*Eskeland v. City of Del Mar* (2014) 224 Cal.App.4th 936, 941-942; accord, *Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 828-829.) We apply the substantial evidence standard, "'resolving all conflicts in the evidence and drawing all inferences in support of'" the agency's findings. (*Ogundare*, *supra*, at p. 829.) However, "[w]ith respect to questions of law, 'we are not bound by any legal interpretation made by the [administrative agency] or the trial court. Instead, we make an independent review of any questions of law necessary to the resolution of this matter on appeal.' [Citation.]" (*Eskeland*, *supra*, at p. 942.)

28

2.      ERCOM Erred in Basing Its Decision on When the Implementation

of the New Performance Evaluation System Occurred

ADDA contends that substantial evidence supports ERCOM's decision that the new performance evaluation system was not implemented until after ERCOM certified ADDA.  In support of its contention, ADDA reviews the factual chronology of the case but cites no authority on the issue of when a change in working conditions is implemented for the purpose of determining whether collective bargaining is required under the MMBA.  We conclude that the focus by ADDA—as well as ERCOM—on whether the new performance evaluation system was "fully implemented" is misplaced.

The MMBA requires "'an employer to negotiate with employees before implementing decisions that are properly the subject of bargaining.'"  (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 188, quoting *San Joaquin County Employees Assn. v. City of Stockton* (1984) 161 Cal.App.3d 813, 819.)  Implementation follows decision.  The question is whether the proper subject of collective bargaining is the decision or the implementation of the decision.  We conclude it is the decision.

Implementation is the carrying out or fulfillment of a decision already made.  (See *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 213 [corporation's dissolution plan gave officers the power "to do any and all acts and things necessary or desirable, to carry out, perform, implement and consummate the [p]lan"]; *Poliak v. Board of Psychology* (1997) 55 Cal.App.4th 342, 350, fn. 4 [proposed "decisions commence the proceedings, and the necessary implementing steps, such as ordering the transcripts or returning the case documents to the ALJ, are merely administrative acts to carry out those commencing decisions"].)  Cases from other jurisdictions have held that it is the decision, or the impacts of the decision, that are the subject of collective bargaining.  For example, in *Kitsap County v. Kitsap County Correctional Officers' Guild* (2014) 179 Wash.App. 987 [320 P.3d 70] the court stated that the issue was "whether the County had a mandatory duty to bargain the decision to implement layoffs."  (*Id.* at p. 994.)  In *Three Rivers Educ. Assn. v. Three Rivers School Dist.* (2013) 254 Or.App. 570 [294 P.3d 547]

the court noted that the Employment Relations Board had explained that under the applicable law, "'[a]n employer must bargain about its decision to change a mandatory subject for bargaining *before* making the decision. While the employer need not bargain a decision to change a permissive subject, it is obligated to bargain about the impacts of its decision before it implements the change. [Citations.]'" (*Id*. at p. 575.) Similarly, in *School Dist. of Indian River County v. Florida Public Employees Relations Com'n* (Fla.App. 2011) 64 So.3d 723 the court noted "that impact bargaining is not required if the public employer is simply enforcing its existing laws, rules, and regulations rather than implementing a new management decision. [Citation.] However, . . . '[a]lthough an employer may act unilaterally on these issues, a public employer may not implement its management decision in a manner that affects wages, hours, or terms and conditions of employment without giving the union notice and an opportunity to bargain over the impact of the decision.' [Citation.]" (*Id.* at p. 729; accord, *Board of Educ. of Region 16 v. State Bd. of Labor Relations* (2010) 299 Conn. 63, 75, fn. 9 [7 A.3d 371]; *Oak Hills Educ. Assn. v. Oak Hills Local School Dist. Bd. of Educ.* (2004) 158 Ohio App.3d 662, 664 [821 N.E.2d 616].)

Perhaps the closest case is *L.W.D., Inc. v. N.L.R.B.* (6th Cir. 2003) 76 Fed.Appx. 73,[5] where the employer claimed "it was not required to bargain over the use of forced ranking" because "it made the decision to switch to a forced ranking system prior to the union election." (*Id*. at p. 76.) The *L.W.D.* court noted that the "NLRA does not explicitly state when the duty to bargain attaches. In *Consolidated Printers, Inc.* [(1992)] 305 NLRB 1061 . . . , the Board ruled that there was no duty to bargain over layoffs where the decision to lay off employees had been made prior to the election. The Board [National Labor Relations Board], adopting the opinion of the administrative law judge, held as follows: [¶] The timing of a decision to lay off a particular group of employees

---

[5] Cases interpreting the National Labor Relations Act (NLRA) provide guidance in interpreting the MMBA. (*County of Los Angeles v. Los Angeles County Employee Relations Com.*, *supra*, 56 Cal.4th at p. 924.)

at a particular time is critical to determining if the employer was obligated to notify and bargain about the decision or its effects. . . . The Board in *Embossing Printers*, 268 NLRB 710, 1984 WL 36015 (1984), dismissed a unilateral change 8(a)(5) allegation that an employer had unilaterally canceled employees' Christmas bonus after a union had been certified as representative of employees. The Board decision turned on its finding that the employer's decision to cancel the Christmas bonus was made before it became obligated to bargain with the union, i.e., before the Board-conducted election." (*L.W.D., Inc.*, *supra*, at p. 76.) The court in *L.W.D.* noted that the Board in *Consolidated Printers, Inc.*, following *Embossing Printers*, found that the employer "'had determined well before the election to work unit employees through the election irrespective of actual work requirements and then to effect substantial and long term as opposed to short term or shortened week layoffs to bring staffing levels in the bindery into conformity with production needs . . . . On this record, given the close timing of the end of the balloting and the announcements of the layoffs to the employees as well as the burden of proof the General Counsel bears on each aspect of his prima facie case, it cannot be said that these decisions were made at a time when [the employer] was obligated to bargain with the Union. Accordingly, [the Board found] that the layoffs initiated the week of the election were decided on by [the employer] before it was obligated to bargain with the Union even though the employees were told of the layoffs and even though the layoffs did not actually begin until after the election.' ([*Consolidated Printers, Inc.*, *supra*,] at [p.] 1067.)" (*L.W.D., Inc.*, *supra*, at p. 76.)

The court in *L.W.D.* noted that the Board cited "no case law that suggests that *Consolidated Printers* and the case cited therein, *Embossing Printers,* are no longer valid. Instead, the Board has relied on the facts, arguing that they were insufficient to show that [the employer's] decision to lay off employees by forced ranking took place prior to the union election." (*L.W.D. v. N.L.R.B.*, *supra*, 76 Fed.Appx. at p. 76, fn. omitted.) The *L.W.D.* court, however, found evidence supporting the conclusion that the decision was made prior to the union election. (*Id.* at pp. 76-77.) The court concluded: "While we are concerned about the short time span between the decision to institute the forced ranking

31

system, the election and the implementation of the forced ranking system, we decline to alter or distinguish the Board's precedent when no party has asked us to do so. We therefore hold that there was insufficient evidence in the record to support the Board's conclusion that the forced ranking system constituted an unlawful unilateral change in employment conditions. Thus, there was no duty to bargain over the use of the forced ranking system in the December 1997 and March 1998 layoffs." (*Ibid.*)

In addition to this case law, PERB decisions involving the statute of limitations support the conclusion that it is the decision, not its implementation, that is subject to collective bargaining. In *South Placer Fire Administrative Officers Association v. South Placer Fire Protection District* (2008) PERB Dec. No. 1944-M [2008 Cal. PERB LEXIS 6, pp. 5-6], addressing the statute of limitations for an unfair competition charge, PERB stated: "In a unilateral change case, the statute of limitations begins to run on the date the charging party has actual or constructive notice of the respondent's intent to implement a change in policy. [Citation.] Here, the Association argues that the statute of limitations began running when it received notice of the District's actual implementation of the change. However, the Board has long rejected arguments that a unilateral change does not occur until it is implemented. (Folsom-Cordova Unified School District (2004) PERB Decision No. 1712; Clovis Unified School District (2002) PERB Decision No. 1504.) Thus, a charging party that rests on its rights until actual implementation of the change bears the risk of running afoul of the statute of limitations." (See *SEIU Local 721 v. County of Riverside* (2010) PERB Dec. No. 2132-M [2010 Cal. PERB LEXIS 51, pp. 11-12] ["'[i]n a unilateral change case, the statute of limitations begins to run on the date the charging party has actual or constructive notice of the respondent's intent to implement a change in policy'"].)

Here, the DAO indisputably made the decision to implement the new performance evaluation system, and ADDA had actual or constructive notice of the DAO's decision, before ADDA was certified. It was at that time any duty to bargain over the decision or the impacts of the decision attached. It was not, as the hearing officer concluded, during

32

the implementation of the prior decision to replace the old paper evaluation form with a new performance evaluation system.

ADDA makes an argument based on the premises that it did not have to file an unfair labor practice charge until it had "clear and unequivocal notice of the violation," which ADDA apparently believes occurs sometime after the Board of Supervisors approves the new performance evaluation system, and that the system violated the Civil Service Rules.[6] The "'clear and unequivocal notice' of the violation" language appears in decisions addressing the issue of when the six-month limitation period for filing an unfair labor charge with the NLRB begins to run. (See *In re Vallow Floor Coverings, Inc.* (2001) 335 NLRB No. 7, p. 1.) These decisions state that the limitation period "does not begin to run until the charging party has 'knowledge of the facts necessary to support a ripe unfair labor practice.'" (*Alternative Services, Inc. and American Federation of State, County and Municipal Employees, AFL-CIO* (2005) 344 NLRB No. 99, p. 2.) They are thus consistent with PERB decisions that "the statute of limitations begins to run on the date the charging party has actual or constructive notice of the respondent's intent to implement a change in policy." (*South Placer Fire Administrative Officers Association v. South Placer Fire Protection District*, *supra*, PERB Dec. No. 1944-M [2008 Cal. PERB LEXIS 6, pp. 5-6].)

Here, ADDA had knowledge of the facts giving rise to its unfair labor practices charge no later than February 2007, when Spillane sent the memorandum to all DDAs

---

[6] ADDA argues: "While the DAO did not have legal authority to change the performance evaluation in the manner in which it did, it had the actual authority to impose the changes on the bargaining members, by *fiat*, thereby giving ERCOM jurisdiction over the premises. . . . The unfair labor practice charge was not ripe until the DAO possessed legal authority for such change. The filing of an unfair labor practice charge does not have to occur until the facts necessary to support a ripe [unfair labor practice charge] are clear. . . . While, theoretically, [ADDA] could have waited until the Board of Supervisors acted, the alternative was to file the unfair charge after demand for bargaining was made and ignored by the DAO with regard to the implementation of the new performance evaluation on April 1, 2008."

explaining the new performance evaluation system. Even if all the ramifications of the new system were not clear, ADDA had "clear and unequivocal notice of the violation" no later than June 21, 2007, when the ADDA board voted to oppose the new system. This occurred before ADDA was certified as a bargaining unit and before any duty to bargain had arisen.

It is true that "an interpretation put forth by an administrative agency charged with enforcement, implementation and interpretation of enactments is entitled to great weight [citation]." (*Microsoft Corp. v. Franchise Tax Bd.* (2012) 212 Cal.App.4th 78, 93; see *People v. Harrison* (2013) 57 Cal.4th 1211, 1225 ["we '"must give great weight and respect to an administrative agency's interpretation of a statute governing its powers and responsibilities"'"].) Ultimately, however, the interpretation of a statute or regulation is a legal question for the court. (*Harrison*, *supra*, at p. 1225; see *Overaa Const. v. California Occupational Safety & Health Appeals Bd.* (2007) 147 Cal.App.4th 235, 244.) The issue of whether a management decision gives rise to a duty to engage in collective bargaining at the time of the decision or the time of implementation is a legal question. (See *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 329 [whether action violated the Fair Labor Standards Act was a legal issue]; *Englund v. Chavez* (1972) 8 Cal.3d 572, 583 [whether employer's action violated the Labor Code was a legal issue].)

Under the MMBA and the ERO, the duty to bargain attaches at the time the employer makes and announces a decision that affects wages, hours, and working conditions, not at the time the employer fully implements that decision. ERCOM's decision that the County had a duty to bargain with ADDA over the new performance evaluation system because the new system "had not been fully implemented at the time the ADDA became certified and demanded to bargain" was erroneous as a matter of law. ERCOM's decision therefore constituted an abuse of discretion (Code Civ. Proc.,

§ 1094.5, subd. (b); *Pedro v. City of Los Angeles*, *supra*, 229 Cal.App.4th at pp. 98-99), and the trial court properly set it aside.[7]

## DISPOSITION

The judgment is affirmed.  The County is to recover its costs on appeal.


SEGAL, J.[*]


We concur:


PERLUSS, P. J.


WOODS, J.

---

[7]     In light of our conclusion that the DAO did not have a duty to bargain with ADDA over the new performance evaluation system, we need not discuss the balancing test set forth in *Claremont Police Officers Assn. v. City of Claremont*, *supra*, 39 Cal.4th 623.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.